[Civ. No. 1251. Fourth Appellate District.—September 14, 1934.]

RALPH ROBINSON, Respondent, v. ARTHUR R. LIND-
BURG, INC., Appellant.

W. H. Stammer for Appellant.

Theodore M. Stuart for Respondent.

MARKS, J.—This action was instituted to recover $98,000 from the defendant. The complaint contains two causes of action: the first, for damages suffered because of the breach of a written contract, and the second, for damages resulting from fraud and deceit in procuring plaintiff to enter into this contract. The jury returned a verdict in the sum of eighteen thousand dollars and this appeal is taken from the judgment entered upon it.

The plaintiff and Arthur Lindburg were college mates, fraternity brothers and friends of long standing. Both graduated in law from the same university, though Lindburg never engaged in its practice, engaging instead in the automobile business in San Francisco. Plaintiff practiced law in that city until April, 1930.

In 1927, Lindburg secured the agency of the Studebaker automobile for Fresno and Tulare Counties. He opened a salesroom and repair-shop in the city of Fresno with branches in Visalia and Coalinga. For the purpose of operating the business he caused to be organized, through

the plaintiff acting as his attorney, a California corporation named "Arthur R. Lindburg, Inc.". All of its common stock, except qualifying shares of its directors, was owned by Lindburg. The plaintiff, Lindburg, Richard K. Morey and others became owners of its preferred stock. The plaintiff was the attorney for the corporation, and, except for a time following April 5, 1930, was its secretary and one of its directors until June 6, 1931. For the convenient handling of the business in Coalinga a separate California corporation, called Coalinga Motors, Ltd., was organized. The plaintiff acted as attorney in incorporating this company. This company was a subsidiary of Arthur R. Lindburg, Inc. Under order of the commissioner of corporations its issued shares of capital stock, excepting three qualifying shares of its directors, were placed in escrow with plaintiff where they have remained ever since. Up to January 1, 1930, Arthur R. Lindburg, Inc., had been a financially successful venture. It had paid dividends on its preferred and common stock and had accumulated undivided profits. The parties are in sharp disagreement on the amount of these profits.

In December, 1929, Lindburg learned of an automobile agency in St. Louis, Missouri, which was for sale. He sought the advice of plaintiff, made an investigation of it and decided to purchase it, provided he could sell approximately a one-half interest in the defendant corporation. He opened negotiations with Morey with the object of selling this interest to him. These negotiations progressed to a point where it seemed probable the sale would be made. With the formal consent of the directors, evidenced by a resolution passed in a directors' meeting held late in January, 1930, the minutes of which are attested by plaintiff as secretary, Lindburg withdrew $75,000 from the defendant corporation and embarked upon the St. Louis venture. This money was obtained by the defendant corporation negotiating something over $83,000 face value of automobile sales contracts to a finance company for a little more than $78,000.

Lindburg organized a Missouri corporation called Arthur R. Lindburg, Inc., for the purpose of conducting the business which he had purchased in St. Louis. The plaintiff

again acted as attorney for Lindburg in incorporating this company.

In the negotiations for the sale of an interest in the defendant corporation to Morey, a financial statement taken from its books under date of December 31, 1929, was used as a basis of determining its net worth. It soon developed that the books of the defendant corporation did not correctly reflect its financial condition. A firm of auditors was employed and a report was made in the latter part of February, 1930, which pointed out many inaccuracies in the books, but which did not purport to be a complete audit. A copy of this report was sent to Morey and another was delivered to plaintiff, who was acting for the defendant corporation and Lindburg in the transaction. It was read by plaintiff and forwarded to Lindburg in St. Louis. A contract of sale to Morey was prepared by plaintiff and sent to Morey by mail but he did not execute it. The plaintiff then conferred with Morey and learned that he would neither execute the contract nor make the purchase. The evidence is conflicting as to the reasons Morey gave plaintiff for withdrawing from the transaction. Morey acted as manager of the defendant corporation after Lindburg went to St. Louis.

Plaintiff went to St. Louis and conferred with Lindburg about the sale of an interest in the California business to Morey. Then for the first time Lindburg proposed a sale of an interest in part of the California business to plaintiff who showed interest in the transaction. The two returned to California together and Lindburg energetically pushed the negotiations for a sale to Morey which resulted in the Tulare County portion of the business being sold to him for $34,000. This was paid, $24,000 in cash, and Lindburg's note to the defendant corporation in the sum of $10,000, which was given for the preferred stock owned by Morey and transferred to Lindburg. Plaintiff attended to the legal details of the sale to Morey for the defendant corporation and Lindburg.

During this same time negotiations were being carried on between Robinson and Lindburg for the sale of a half interest in the remaining part of the business of the California corporation to Robinson. Robinson had little ready money and could not pay for a one-half interest in the net assets

of the business as they then appeared to exist. Lindburg offered to "squeeze down" the value of the net worth of the corporation to the sum of $40,000 by withdrawals of capital and to sell a one-half interest in the residue for $20,000. The negotiations resulted in the execution of a contract, prepared by plaintiff, which provided for the sale of a one-half interest in the business of the California corporation to the plaintiff.

This contract, executed on April 5, 1930, forms the basis of the instant action and its terms require careful consideration. It was agreed that the assets of the corporation were "of the reasonable market value of not less than Forty Thousand and no/100 ($40,000.00) Dollars over and above said obligations and liabilities, aside from the good will thereof". The corporation agreed to sell, and plaintiff agreed to buy, "a one-half interest in its Fresno Branch automobile business and the personal property, good will and other assets therein contained" for $20,000, $4,000 to be paid in cash on or before April 12, 1930, and $6,000 to be paid as soon as plaintiff could sell his San Francisco residence and liquidate other investments, but in any event, within one year. The remaining $10,000 was to be paid out of the profits of the business. By mutual agreement the time for making the cash payments was later extended. The contract provided: "Second party (Robinson) agrees to accept employment as Manager of the new business enterprise at a monthly remuneration of Seven Hundred Fifty and 00/100 ($750.00) Dollars, and agrees to conduct the business in the manner heretofore conducted by First Party as near as possible, and said First Party hereby consents to the employment of Second Party as Manager for the remuneration as hereinabove set forth, and agrees to offer suggestions and generally assist said Second Party in the problems to be confronted by him while carrying on his duties as such Manager." It was agreed that the parties might organize a new corporation or use "Coalinga Motors, Ltd.", for the purpose of conducting the new business; that the books should be kept in accordance with "the Studebaker Accounting System" and that "used cars shall always be inventoried at the values fixed by what is known in the trade as the 'Blue Book'". The defendant corporation was

given "the prevailing voice" in the management of the business until Robinson's one-half interest should be paid for in full. The contract also provided that: "This agreement shall remain in full force and effect for a period of ten years from date unless modified and changed by the mutual consent of the parties hereto. In the event the capital of the business, which is fixed at this time by First Party as being of the value of $40,000.00 should, due to mismanagement or other causes shrink in value to an amount equal to twice the value of Second Party's investment at the time (if for example Second Party's investment should amount to $10,000.00 and the value of the business should be reduced to a total of $20,000.00 from $40,000.00), then the entire business should be sold to the highest bidder or liquidated in the manner best for all parties interested, and the moneys received therefrom distributed in accordance with the financial interests of the parties to this agreement at that time.

"It is agreed by the parties to this instrument that the value of the assets as shown by the books of account of party of the First Part for the period between December 31, 1929, and April 1, 1930, cannot be definitely determined due to the fact that the said books of account have been inadequately kept; and it is further agreed that after the proper entries and adjustments have been set up on said books, taking into consideration all business operations up to and including the 31st day of March, 1930, that the value of the First Party's business shall be determined. If such value is not of the reasonable value of $40,000.00, then the price which said Second Party shall pay for his said one-half interest shall be adjusted in accordance with such value, and in the event the value of said business shall be reasonably worth more than $40,000.00, then the price which said Second Party shall pay for his said one-half interest shall be increased according to the proportion to such increased valuation. Values as in this instrument expressed shall not include good will. In the event the values do not amount to $40,000.00, First Party has the privilege of adding to said assets sufficient additional amount to make the reasonable value of the assets consisting of said business in the amount of $40.000.00." The defendant corporation agreed to provide sufficient cash

and other liquid assets with which to properly operate the business, in the form of a loan to bear interest at the rate of eight per cent. The contract also contains the following: "The price which Second Party shall pay as in Paragraph Twelve provided for his one-half interest shall be to the amount of eighty per cent thereof only and the remaining twenty per cent of said one-half interest shall be paid for in accordance with the book values as shown on April 30, 1931."

A study of the contract leaves the distinct impression that it provided that the business in which an interest was sold should have had a "reasonable market value" of not less than $40,000 exclusive of good will, and that a one-half interest in the business and its properties as they existed on April 5, 1930, was to be sold. ■ However, a very different construction seems to have been placed upon it by the parties. "Reasonable market value", exclusive of good will, seems to have been considered by them as synonymous with "net assets" or "net worth", exclusive of good will. They also seem to have considered that the contract contemplated the sale to plaintiff of only "net assets" or those having a "net worth" of $40,000 and as having given the defendant the right to withdraw assets exceeding that amount. This theory was very apparent during the trial in the court below. The plaintiff and Lindburg were men of education and considerable experience who should have known what they intended to express in their wording of the contract. Having put their own interpretation on these provisions of this contract by their conduct during the thirteen months of operations, it must be accepted as their true intention as to the meaning of the language they used in it when it was executed. This construction must prevail until and unless future evidence shows our deductions as to their interpretations to be wrong. (*Skousen* v. *Herz*, 135 Cal. App. 116 [26 Pac. (2d) 498].)

Before the execution of the contract, but after plaintiff and Lindburg had progressed sufficiently with their negotiations so that their ultimate agreement was probable, Lindburg, with the knowledge of plaintiff, conducted a used car sale and withdrew $15,000 from the business of the California corporation. After April 5, 1930, Lindburg re-

turned to St. Louis and plaintiff assumed the management of the new business.

The books of the defendant corporation not having been properly kept, plaintiff, after advising with Lindburg, employed C. L. Austin as bookkeeper. Austin was instructed to straighten out the records and correctly determine the assets and liabilities of the old company and those to be assigned to the new concern. No statement entirely satisfactory to both parties was ever prepared. No physical division of the assets and liabilities of the old company was ever made so that the particular property having a net worth of $40,000, over liabilities, could be definitely identified as property of the new concern and the other assets and liabilities recognized as those of the old company. In September, 1930, Austin produced a statement which purported to show assets and liabilities as of March 31, 1930. The headings on each sheet, showing assets and liabilities, are the same and give some idea of the method attempted in the segregation. They are as follows:

ARTHUR R. LINDBURG, INC.,

Assets
(Liabilities) March 31, 1930

| Ledger Balance March 31, 1930 | Adjustments | | New Company | Old Company |
|---|---|---|---|---|
| | Debit | Credit | | |

Following these headings are columns of figures opposite most general descriptions of the items they purport to represent. It is true that a number of the items could be identified and some few were identified in the evidence. No attempt was made as to others. An illustration of the method of accounting used, which undoubtedly led to confusion, appears on the sheet setting forth the liabilities, and following the words "Notes Company Account", each company, the old and the new, is charged with $60,152.67. To complete the confusion, Robinson, as manager of the new company, took possession of all of the assets including cash on hand in the sum of $20,677.93, and proceeded to pay the liabilities as they became due. Seventy-three cars that had been sold prior to April 1, 1930, upon conditional sales contracts which had been negotiated to a finance company were re-

possessed and the finance company repaid. The same was true of sixty cars sold after Robinson assumed control. These repayments were made out of the general assets or incomes of both concerns. The parties treated the transactions as though the new company owned all of the assets and owed all of the liabilities, with the defendant corporation having the right to withdraw cash to reduce the net assets or net worth to the sum of $40,000.

Robinson paid $7,000, on account of the ten thousand dollar cash payment, on the purchase price of his interest. The business was a losing venture from the time he took control, so nothing was ever paid on the $10,000 to be paid out of earnings.

Lindburg returned from St. Louis in September, 1930. At that time the California concern had on hand a large stock of used cars which neither Lindburg nor Robinson desired to carry into the winter months. They decided to hold another used car sale. This produced between twelve and fifteen thousand dollars in cash. At that time Lindburg maintained that the defendant corporation was entitled to withdraw something over $18,000 from the new business to reduce the net worth of its assets as of April 5, 1930, to $40,000. He demanded payment of $15,000. Robinson objected to the withdrawal of this amount upon the ground that the money was needed in the new business. Lindburg prevailed and received a check for $15,000; payable to the defendant corporation, which was subsequently cashed. Robinson signed this check on the bank account of the new business.

Up to that time the California business had been conducted under the name of Arthur R. Lindburg, Inc. Robinson desired that his name appear in the business and it was agreed between him and Lindburg that the name of Coalinga Motors, Ltd., be changed to Robinson-Lindburg, Ltd. This was done with Robinson acting as attorney and the California business was thereafter conducted under that name. No change in the issued stock seems to have been made. It was held by the plaintiff in escrow as before. Lindburg made a personal guarantee of $10,000 to be loaned to the California business by a Fresno bank. It does not appear that any loan was made. No deposit of that amount appears

in the bank statements of the California business for September, October, November or December, 1930.

Lindburg went back to St. Louis where he remained until the last of December, 1930. He returned to Fresno about December 29th. He maintained that the Fresno business owed defendant corporation over $6,000 in order to reduce its net worth at the time of the sale to $40,000. He demanded and received a check for the amount claimed. This was signed by Robinson, who, however, objected to the withdrawal of the money from the business and later stopped payment on it. The funds of the business were reduced and Lindburg gave another personal guaranty to the Fresno bank for a ten thousand dollar loan which was made to Robinson-Lindburg, Ltd., He returned to St. Louis about the middle of January, 1931.

The financial affairs of the business rapidly became worse. Its sale or liquidation was seriously discussed in correspondence between Lindburg and Robinson. Lindburg desired to liquidate if a sale could not be made, because of the heavy losses the business had sustained, and Robinson wished to continue. Lindburg came to Fresno during the latter part of May, 1931, and decided that the business should be liquidated. In the minute-book of Robinson-Lindburg, Ltd., the minutes of a meeting held on June 6, 1931, contains the following resolution: "That this corporation proceed to liquidate its assets and apply the same against its obligations; that Mr. Arthur R. Lindburg be given full power and authority of the company in said liquidation and to have charge thereof on behalf of this corporation, and he is hereby directed to liquidate the assets of the corporation and to apply the same against the indebtedness of this corporation. And be it further resolved that any and all banks having or to have accounts of this corporation shall be instructed to honor the signature of Arthur R. Lindburg alone against said account, and to cancel the prior authority of Ralph Robinson and C. L. Austin to draw against the said accounts or to transact business in relation thereto." Robinson denied participation in this meeting and claimed to have had no notice of it. It does not appear that it was a regular meeting of the board of directors nor is there any evidence that it was a regularly called special meeting. Robinson and Austin signed written instructions to the bank which

was depository for Robinson-Lindburg, Ltd., directing it to honor company checks signed by Lindburg, and no others.

Lindburg took possession of the assets of the corporation and proceeded to sell them wherever a market could be found. The sum of $46,166.24, including an advancement of $4,928.99 by Lindburg to pay pressing claims, was realized and all or probably the greater part was applied on bills. There remained some unpaid obligations and some assets of undetermined value. The evidence as to what became of some of the assets, the value of assets remaining and the obligations unpaid is far from being either clear or satisfactory. A study of the record leaves the impression that the amount of the unpaid liabilities considerably exceeded the value of the remaining assets.

In his first cause of action plaintiff alleged eleven breaches of contract upon which he sought to predicate his right to recover damages. In an amendment to his complaint to conform to the proof filed at the close of the evidence, plaintiff alleged that defendant "delivered to plaintiff in said business assets and property worth not to exceed $30,000.00" instead of the value of $40,000 as set forth in the contract. Plaintiff alleged his damages resulting from the breach of contract as follows: 1. The loss of the $7,000 paid by him; 2. The loss of $81,000 wages to be earned in the remaining nine years of the ten-year item of the contract; 3. The loss and destruction of his title and ownership "in the present assets of said corporation in the additional sum of $10,000.00."

The second cause of action is for damages resulting from the fraud and deceit of defendant in procuring plaintiff to execute the contract of purchase. The elements of damage are alleged in the identical form in which they are set forth in the first cause of action. The same amendment to conform to the proof was made to the second as to the first cause of action. This amendment was probably sufficient to be construed as an allegation of the actual value of the property received by the new business, one-half of which was to become the property of the plaintiff. There is no direct allegation as to the value the property would have had if the alleged fraudulent representations had been true. The price to be paid was alleged.

It is well settled that where a party who is induced by fraud and deceit to enter into a contract, stands upon the contract and seeks to recover damages for the fraud, the correct measure of his damage is the difference between the actual value of the property received and the value it would have had had the fraudulent representations been true. (*Divani* v. *Donovan*, 214 Cal. 447 [6 Pac. (2d) 247]; *Porter* v. *Hilton*, 214 Cal. 705 [298 Pac. 501, 7 Pac. (2d) 301]; *Hunter* v. *McKenzie*, 197 Cal. 176 [239 Pac. 1090]; *Paolini* v. *Sulprizio*, 201 Cal. 683 [258 Pac. 380].) The price paid is some evidence of the value the property would have had if the representations made had been true. (*Divani* v. *Donovan, supra.*)

We have searched the 836 pages of typewritten transcript and the 687 pages of printed briefs and can find no evidence, or reference to evidence, of the value the property would have had if the alleged fraudulent representations had been true, other than the statement in the contract of the purchase price to be paid. It is alleged by plaintiff that the total value of the property delivered was $30,000. This would fix the value of his half interest at $15,000. The maximum amount which the plaintiff could be called upon to pay would be $20,000, upon which he actually paid $7,000. The $20,000 was subject to a twenty per cent reduction depending on "book values as shown on April 30, 1931". The only evidence in the record shows that the book value of the business was $14,681.92 on that date. If the $20,000 purchase price had been paid, the plaintiff's recovery for deceit must be limited to $5,000 as he admitted receiving property of the value of $15,000. The meaning of the twenty per cent reduction clause in the contract, which was prepared by plaintiff, is most uncertain. If we assume that the twenty per cent, or $4,000, of the purchase price was to be scaled down in the proportion that the book value of the property had been reduced below $40,000, it would reduce his total payments to be made to a little less than $17,400. Had this sum been paid his damage under this cause of action could not be more than $2,400, he having admitted receiving $15,000. Plaintiff admitted that the business was a losing venture and made no profits. He could be required to pay only $10,000 in cash for the property and nothing more unless there were profits. He actually

paid $7,000. He admits receiving property of the value of $15,000. In connection with the cause of action seeking damages for fraud and deceit, under no view of the case can the verdict and judgment for $18,000 damages be sustained by the pleadings and proof now in the record.

As we have seen, the allegations of damage are confined to three separate items: the loss of the $7,000 paid by plaintiff on the purchase price of the business; the loss of $81,000 as future salary to accrue during the balance of the ten-year term of the contract; the loss of $10,000, the alleged value of plaintiff's interest in the present assets of Robinson-Lindburg, Ltd. This last allegation must be construed as having the effect of alleging that the value of the total "present assets" of Robinson-Lindburg, Ltd., was $20,000 as plaintiff was to acquire only a one-half interest in them.

In approaching the question of the correctness of the judgment on the first cause of action it is apparent that the answer to one question must be determinative of this appeal, namely: Was the defendant authorized by the contract of April 5, 1930, to liquidate the business of Robinson-Lindburg, Ltd., under the evidence now in the record? There are many other questions argued in the briefs which we purposely refrain from discussing as it would be extremely difficult to do so without commenting on the weight and sufficiency of evidence that of necessity must be produced at another trial.

A paragraph of the contract which we have already quoted provides that if the capital of the business should shrink to an amount equal to twice the value of Robinson's investment, the entire business should be sold to the highest bidder or liquidated. It is clear from this language that since Robinson had $7,000 invested and if the capital had shrunk to $14,000, the contract provided for either the sale of the business as a whole or its liquidation. The only evidence which we can find in the record, or to which we have been cited in the briefs, fixes the net worth of the assets on May 31, 1931, at the sum of $12,449.99. Some effort was made to find a purchaser for the business before Lindburg proceeded to liquidate.

Of course, if the losses in the business during the thirteen months in which Robinson managed it were due primarily to prevailing business conditions, or his inexpe-

rience, or mismanagement, he could not recover his original investment. A causal connection between the alleged breaches of the contract and the business losses must be proved. Proof of this causal connection is lacking in the record. At another trial it should be thoroughly developed whether or not the heavy withdrawals of cash from the business were justified under the terms of the contract. The evidence in the present record supports the conclusion that they were regularly made. However, there were many questions on this subject suggested by the evidence which remain unanswered.

The contention that the $81,000 future salary could be recovered as damages for breach of the contract is based on the assumption that the business was to be conducted and plaintiff was to be employed at a salary of $750 per month for the full period of ten years. The contract did provide that it should remain in full force and effect for ten years. It also contained the liquidation clause which we have already considered and quoted. That all provisions of a contract must be construed together is too elemental to need citation of authorities. Construing these two paragraphs of the contract together and paraphrasing them we have the following: The agreement shall remain in full force and effect for a period of ten years unless modified by mutual consent and unless the business is liquidated because of the shrinkage of the value of its capital to an amount equal to twice Robinson's investment. If the contract could be construed as providing for the employment of Robinson at a fixed salary it could not be construed as an agreement to pay this salary after liquidation if the liquidation was authorized by and carried out in accordance with the terms of the contract. As we have seen the evidence now before us supports the conclusion that the defendant corporation was authorized to liquidate the business. If the liquidation was not fairly done the amount of loss is not in evidence. In connection with the allegations of loss of future salary it should be observed that Robinson, as manager of the business, twice voluntarily reduced his salary so that he was receiving $500 a month at the time of liquidation instead of the $750 per month specified in the agreement. It should also be remembered that Robinson testified that he became a partner in another new business in Fresno on

June 15, 1931; that he had a drawing account of $200 per month from this business and that it made a profit from the day it commenced operations.. The amount of these profits, or the share of them to which Robinson has been entitled, does not appear from the record.

 The remaining element of damage claimed by Robinson was the loss of his share of the "present assets" of Robinson-Lindburg, Ltd. We might assume that the words "present assets" were intended to refer to the assets at the time of liquidation. If they refer to the time of the filing of the complaint, then they might be construed to mean that there were $20,000 assets of Robinson-Lindburg, Ltd., remaining after liquidation. Of course, Robinson would be entitled to his share of such assets if any remained. He should be entitled to insist that the liquidation be fairly and equitably conducted. The only evidence in the record is to the effect that after the liquidation the liabilities exceeded the book value of the remaining assets, which had a very questionable actual value. At another trial the question of the fairness of the liquidation and the amount of the remaining assets and liabilities, if any, should be thoroughly developed so that justice might be done between the parties.

Judgment reversed.

Barnard, P. J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 11, 1934, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 13, 1934.