[Civ. No. 19236.   Second Dist., Div. Two.   May 8, 1953.]

CHARLES WILSON et al., Appellants, v. CORRUGATED KRAFT CONTAINERS, INCORPORATED (a Corporation), Respondent.

Hanna & Morton, Harold C. Morton, James M. McRoberts and Max K. Jamison for Appellants.

Bronson, Bronson & McKinnon for Respondent.

FOX, J.—Plaintiffs appeal from a judgment for defendant in an action for an alleged breach of a sales contract.

Plaintiffs are wholesale jobbers of corrugated paper products and other packaging material whose business operations are concentrated in the Southern California area. Defendant is a manufacturer of corrugated boxes. During 1944, a period of great scarcity prevailed with respect to the supply of corrugated boxes, with all indications suggesting that this shortage would be protracted. On December 15, 1944, the parties entered into a written contract which, in one of its opening clauses, recognized the existence of "an emergency situation pertaining to the supply of paper board." By its provisions, defendant agreed to sell and plaintiffs to buy *all of plaintiffs' requirements* of corrugated paper products during the period January 1, 1945, to December 31, 1949, not exceeding 200 carloads yearly or approximately 4,000,000 square feet per month. Should plaintiffs desire to purchase more than 200 carloads during any year, the contract specified that such excess requirements must first be offered for acceptance to defendant; in the event of defendant's refusal to accept such orders, plaintiffs were privileged to purchase from other sources the orders rejected by defendant. In one part of the contract, plaintiffs were referred to as "a jobber who buys exclusively" from defendant. Plaintiffs

also agreed (1) to submit to defendant a list of its present customers; (2) before soliciting a prospective customer, to ascertain whether such prospect was buying from defendant; and (3) to refrain from soliciting business from cannery firms without procuring defendant's consent.

During the year 1945, plaintiffs submitted to defendant all of their requirements, of which defendant accepted and filled only orders amounting to 155 carloads, or 41,450,000 square feet. During 1946, plaintiffs tendered orders in excess of 200 carloads, of which defendant accepted and filled the amount of 153 carloads, consisting of 46,418,480 square feet. However, although in each of these years defendant rejected some orders and accepted others on a selective basis, plaintiffs interposed no objection to this procedure nor did they at any time claim it was in violation of the contract. Commencing early in May, 1946, plaintiffs began to make very substantial purchases of war surplus corrugated boxes from outside sources without first submitting the orders to defendant. Plaintiffs alleged they made these purchases, which cost $362,466.28, with defendant's knowledge. However, the trial court found that defendant had not consented to such purchases and only discovered the facts late in December, 1946, at which time it informed plaintiffs it would no longer proceed with the contract. In February, 1947, defendant formally cancelled the contract pursuant to its earlier notice of termination. Thereafter plaintiffs brought this action, alleging that defendant's wrongful refusal to perform had resulted in a substantial loss of profits and good will to plaintiffs.

By way of clarification it must be observed that from the viewpoint of the manufacturer there is a great disparity in desirability between the production of certain types of simple boxes as opposed to others requiring a more complex type of fabrication. Stock boxes, which are the most commonly used and for which there is a relatively constant demand, are an especially attractive item of manufacture, since an amount greater than the ordered quantity will normally be produced during a particular "run," thus serving to reduce expenses by spreading the cost of setting up the machine for the "run" over a larger number of boxes, with reasonable assurance that the excess will be later sold. Special boxes, which are tailored to fit the peculiar needs of a customer, lack this advantage in that they are produced to order with less possibility of spreading out the "setting up" costs.

The record shows that on April 22, 1946, plaintiffs wrote a letter asking defendant for permission to make a purchase of boxes from an outside source. On the following day, defendant replied that it had no objection, but stated that its permission was restricted to that single item. Less than three weeks later, plaintiffs undertook their large-scale program of "outside" buying without tendering these orders to defendant. These clandestine purchases continued for six months until defendant's discovery of the situation precipitated its termination of the contract between the parties.

The testimony indicated that the shortage of paper products began to ease up shortly after the end of the year 1946. During the latter year, defendant was filling orders from its various customers to the extent of its capacity, allocating supplies to them on a quota basis, but whenever possible endeavoring to give preference to orders for boxes which it considered most advantageous and attractive for it to make, in view of the shortage both in material and labor supply.

Plaintiffs contend that their failure to submit all of their requirements to defendant did not constitute a breach of contract under the circumstances here present. In support of this argument, they first assert that defendant was obligated under the contract to manufacture plaintiffs' requirements up to 200 carloads per annum and defendants did not have the right "to pick and choose," from among the first 200 carloads ordered, which of plaintiffs' requirements it desired to manufacture. They urge that the trial court erred in placing upon the contract an interpretation which allowed defendants to select from the "excess requirements in order to fill the minimum requirements." With these contentions we are unable to agree.

The court found that "As permitted by the contract, defendant, on occasions, rejected offers from plaintiffs to purchase corrugated paper products, but defendant did not . . . thereby release plaintiffs from their contractual obligation to submit to defendant for acceptance by it orders for all of *their requirements of corrugated paper products before purchasing the same or any part thereof from other vendors*, and this was understood by plaintiffs." This finding is fully supported by the evidence. At no time did plaintiffs treat defendant's rejection of any of their orders as a breach of contract or give any indication that this was a violation of the terms of the agreement. On the contrary, the evidence

plainly demonstrates they acquiesced fully in such procedure. On this state of the record, plaintiffs are in no position to argue at this time that defendant did not have the right to choose from among plaintiffs' orders so long as it fulfilled its obligations as to quantity under the contract. ■ The practical construction placed upon an instrument by the conduct of the parties is entitled to great weight by the trier of facts in resolving a possible uncertainty of meaning. (*Rosenberg* v. *George A. Moore & Co.*, 194 Cal. 392 [229 P. 34]; *Robinson* v. *Arthur R. Lindburg, Inc.*, 140 Cal.App. 669 [35 P.2d 1057].)

■ Plaintiffs also argue that the fact that defendant picked and chose from among the orders given and the fact that it was operating at capacity to fill the orders it did select establishes that the failure of plaintiffs to submit all of their orders to defendant was not a material breach of contract. However, it is fully apparent from an analysis of the provisions of the contract, the language used therein to designate the relations between the parties and the circumstances under which it was executed, as well as from the interpretation given it by the parties themselves, that the agreement imposes upon plaintiffs the obligation of submitting all their requirements to defendant. This is inescapable if proper effect is to be given the provision that "Buyer hereby agrees to purchase . . . all of Buyer's requirements," not in excess of 200 tons from defendant, and to first offer all requirements in excess of that figure to defendant.* It is fortified by the designation in the contract of plaintiffs as jobbers buying exclusively from defendant. Though plaintiffs were not required to purchase a single box, yet, if they had requirements, they were bound to submit them to defendant. Yet this is precisely what plaintiffs failed to do. This was the core and crux of the contract from the defendant's standpoint. At a time when

---

*The contract in this respect provides as follows:

"(1) The Seller hereby agrees to sell and deliver and the Buyer hereby agrees to purchase, accept and pay for all of Buyer's requirements of corrugated paper products for Buyer's own use and for the purpose of resale not, however, to exceed two hundred (200) carloads per annum or approximately four million (4,000,000) square feet per month during the term and period of five (5) years, commencing January 1, 1945, and terminating December 31, 1949. In the event, however, that Buyer shall desire to purchase more than two hundred (200) carloads per annum, it shall first offer such excess purchases to Seller for acceptance by it. In the event that Seller shall refuse to accept such excess orders in whole or in part, then Buyer shall be privileged to make such purchases as shall have been turned down by Seller from other sources of supply."

a seller's market prevailed, it is clear the dominant measure of advantage to defendant in entering into such a contract was (1) the right to accept the most desirable orders in meeting its obligation to furnish plaintiffs with at least 200 cars per year of its total requirements, and (2) the right to fill as much as it desired of plaintiffs' requirements in excess of 200 carloads per year. That plaintiffs' willful departure from a fundamental obligation under the contract constituted a material violation thereof is too apparent to admit of controversy. (*Blahnik* v. *Small Farms Imp. Co.*, 181 Cal. 379, 381 [184 P. 661].) ■ Where, as here, the contract was manifestly an entire and indivisible one with interdependent covenants (*Lewis* v. *Shell Oil Co.*, 220 Cal. 80 [29 P.2d 413]), and plaintiffs' default in performance went to the very root of the consideration bargained for, such breach amounted to a failure of consideration, entitling defendant to rescind. (Civ. Code, § 1689 (2); 4 Cal.Jur., p. 785; 6 Cal.Jur., pp. 391-392; Grismore on Contracts, pp. 208-213. See *De Burgh* v. *De Burgh*, 39 Cal.2d 858, 863 [250 P.2d 598].) Plaintiffs' attempt to gainsay the significance of this breach by asserting that defendant could not and would not have filled more than 200 carloads of goods is singularly without force in the light of the fact that the evidence shows that they initiated their outside purchases of boxes, much of which defendant testified it would have produced for them, even before they had submitted to defendant orders for 200 carloads of corrugated goods.

Finally, plaintiffs argue that defendant was not justified in cancelling the contract, despite their outside purchases, since defendant did not suffer any pecuniary damage. The fact that defendant might have sold its product elsewhere under the fortuitous circumstances here prevailing does not minimize the materiality of plaintiffs' violation of its fundamental obligation under the contract; nor should it affect defendant's right to insist on receiving from plaintiffs the crucial benefit flowing to it under its bargain. To embrace the validity of such an argument would give rise to an anomalous result. On this theory, plaintiffs might have refused all performance by abstaining from submitting any requirements to defendant, yet, despite a total breach, could urge it was of insufficient materiality to warrant termination simply because defendant had another market for its total product. It would create the absurd effect of binding defendant to a contract

in which plaintiffs' obligation is illusory and chimerical, while permitting a plaintiff in willful default to make capital of his own wrong.

The existence of financial detriment to the innocent party is not essential in order to excuse his further performance. A willful default may be material though no economic loss ensues. (See *Lewis* v. *Shell Oil Co., supra; May* v. *New York Motion Picture Corp.*, 45 Cal.App. 396 [187 P. 785].) The occurrence of a failure of consideration resulting from the willful failure of plaintiffs to perform an integral part of an entire contract is sufficient to entitle defendant to cancel. (*Sterling* v. *Gregory,* 149 Cal. 117, 118 [85 P. 305]; *Torrey* v. *Shea,* 29 Cal.App. 313, 319 [155 P. 820].) It has repeatedly been held in this state that a breach of a requirements contract by trafficking with outside sources or competitors is by its very nature material and will give the injured party the right to cancel. (*Twomey* v. *People's Ice Co.,* 66 Cal. 233 [5 P. 158]; *Sterling* v. *Gregory, supra; Lewis* v. *Shell Oil Co., supra; Robinson* v. *Boulevard Express, Inc.,* 17 Cal.App.2d 492 [62 P.2d 424].) In *O'Bryan* v. *Mengel Co.,* 224 Ky. 284 [6 S.W.2d 249], plaintiff had agreed to buy all of its requirements of boxes from defendant. During the term of the contract and without defendant's knowledge, plaintiff purchased from another concern a large quantity of boxes of the kind covered by the contract. Defendant learned of this purchase and gave notice of its intention no longer to be bound by the contract. Plaintiff sued to recover damages for defendant's refusal to continue under the contract. In holding that defendant was within its rights in refusing further performance, the court stated: "When a party to a contract, in violation thereof, buys from others in material amounts the articles covered by the contract, he thereby enables the other party rightfully to cancel the contract, and destroy the benefits thereof to the other so far as it remains unexecuted." (P. 252.) In the case at bar, plaintiffs purchased from other suppliers corrugated paper products in 1946 in the amount of $362,466.98 without first tendering such orders to defendant as was its duty under the contract. During the same year its total purchases from defendant were $510,540.73. There is thus substantial evidentiary support for the trial court's finding of the material character of plaintiffs' departure from its contractual obligations. For the reasons already stated, defendant was justified in con-

sidering itself discharged from further performance under the agreement.

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied June 3, 1953, and appellants' petition for a hearing by the Supreme Court was denied July 2, 1953. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.