**SOUND/CITY RECORDING CORPORATION**

v.

**David SOLBERG, a/k/a David Soul.**

**Civ. A. No. 77–0648.**

United States District Court,
W. D. Louisiana,
Shreveport Division.

Feb. 1, 1978.

John M. Madison, Jr., James R. Madison, Wiener, Weiss, Madison & Howell, Shreveport, La., for plaintiff.

**1376**

Caldwell Roberts, Mayer, Smith & Roberts, Shreveport, La., Donald S. Passman, Gang, Tyre & Brown, Hollywood, Cal., for defendant.

STAGG, District Judge.

## OPINION

On June 16, 1977, Sound/City Recording Corporation (Sound/City) filed this complaint against David Solberg, more commonly known as David Soul (Soul), alleging that Sound/City and Soul had entered into a contract to record and market vocal performances by Soul. According to the complaint, the contract provided for Sound/City to own all "master recordings" made pursuant to the contract. The complaint further alleged that Sound/City had attempted to sell certain master recordings to Nems Record, Limited (Nems), for royalties from sales in Great Britain and that Soul had claimed ownership of the recordings, causing the deal with Nems to collapse. Sound/City sought a declaratory judgment that it owned the recordings as well as damages for slander of Sound/City's title.

Soul admitted entering into the contract with Sound/City, but claimed that the recordings in question were not "master recordings", but "demonstration recordings". He claimed that Sound/City had breached its obligations under the contract, so that he had the right to rescind it. In a counterclaim, Soul sought a declaratory judgment that he owned the recordings in question, and he sought an order of the Court requiring Sound/City to deliver to him the recordings made pursuant to the contract and all reproductions of those recordings.

The Court has determined that Soul may rescind the contract he made with Sound/City. His action in rescission has not prescribed, and it is not barred by the statute of limitations. Soul, not Sound/City, owns the recordings in question. Before Sound/City must return the recordings to Soul, Soul must compensate Sound/City for its contribution in making the recordings in the amount of $16,090.

## FINDINGS OF FACT

In 1969, Sound/City was a fledgling recording studio in Shreveport, Louisiana, and Soul was one of the co-stars of the ABC-TV series, "Here Come the Brides". Sound/City hoped to establish a thriving recording business, and Soul hoped to begin a recording career. Various circumstances brought Sound/City and Soul together to negotiate a recording contract.

Sound/City and Soul entered into a recording contract on August 16, 1969. The contract had a principal term of one year, expiring at midnight the night of August 15, 1970. Sound/City could extend the contract, at its option, for an additional year by releasing three singles and one album during the principal term of the contract, and by giving Soul thirty (30) days' written notice of its intention to exercise its option. In addition, to exercise its right to extend the contract, Sound/City had to pay Soul $3,500.

Paragraph 6(a) of the contract provided the principal obligation of Sound/City:

"6. During the term of this agreement, the Company agrees to release the following minimum number of recordings:

"(a) During the principal term and the first extension period—three (3) singles and one (1) album during each year comprising the principal term and the first extension period.

\* \* \* \* \* \*

"Additional records shall be released during the principal term or any extension period at the election of Company, but shall not reduce the minimum requirement in any succeeding period. Records shall be released only under Company's top label."

In return for this obligation, Soul gave Sound/City ownership of all "master recordings" to use for Sound/City's commercial benefit:

"16. All master recordings recorded hereunder, and all matrices and phonograph records and related audio reproductions manufactured therefrom, together

with the performances embodied thereon, shall be entirely the property of Company, free from any claims whatsoever by Artist or of any person deriving any rights or interests from Artist. Without limiting the generality of the foregoing, Company and/or its subsidiaries, affiliates and licensees shall have the unlimited right, from time to time, to manufacture, by any method now or hereafter known, phonograph records and related audio reproductions, on any mediums or devices now or hereafter known, of the master records, or any part thereof, made hereunder and included in this contract; and to sell, transfer or otherwise deal in the same throughout the world under any trademark, trade names and labels, or to refrain from such manufacture, sale and dealing, except as provided herein."

Recording sessions began almost immediately after the contract was signed. Nearly all of them took place in Shreveport, although some recordings were made in Nashville, Tennessee. Pursuant to the contract, Sound/City paid all expenses of recording, including the travel expenses of Soul and the salaries of the musicians and technicians. The expenses of recording during the year totaled $13,390. Soul and Sound/City spent approximately 100 hours in recording sessions from August, 1969, through January, 1970. The normal studio rental charged during the term of the contract by Sound/City was $50 per hour. In the contract, Sound/City agreed not to charge Soul any rental for the use of the studio.

Sound/City did not release any recordings under its label during the term of the agreement. It did succeed in selling the rights to "The Road is Long" and "This Train" to Famous Music Corporation (Famous Music), a division of Paramount Records. Famous Music released the songs as a single 45 r. p. m. recording on the Paramount label. Famous Music paid Sound/City a net sum of $2,300 to reimburse Sound/City for its production costs for the two recordings. Sound/City neither released nor caused the release of any other recording during the term of the agreement.

Sound/City did not exercise its option to renew the contract. Thus, the agreement between Soul and Sound/City expired at midnight, August 15, 1970. Sound/City did nothing with the recordings made pursuant to the contract until after Soul had become a popular television star on the series "Starsky and Hutch" and had begun a successful recording career on another label.

In approximately mid-year 1976, Sound/City began to look for a market for its recordings of Soul. On October 20, 1976, Stewart Madison, president of Sound/City, wrote to Allen Grubman of the law firm of Grubman and Indursky concerning the marketing of some recordings of Soul. When Soul was informed of Sound/City's desire to release some of his recordings, he had his attorney, Donald Passman, inform Sound/City by letter of December 30, 1976, that he claimed that Sound/City did not have the right to release the recordings.

In early 1977, Sound/City began negotiating with Nems to grant Nems a license to distribute Soul's recordings in Great Britain. A telegram of March 23, 1977, from Lee Phillips of Nems to representatives of Sound/City set forth the first details of the deal. Exhibit P–32. On April 7, 1977, Lee Phillips transmitted a draft of an agreement between Sound/City and Nems for the Soul deal.

On May 11, 1977, Solomon Granett, representing Soul, wrote Allen Grubman again to inform Sound/City and its representatives of Soul's position that the 1969 contract was rescinded and abandoned and that Sound/City had no right to release any recordings made during the term of that agreement. Nonetheless, Sound/City continued to negotiate the deal with Nems.

On June 3, 1977, Solomon Granett wrote Stewart Madison setting forth Soul's position more fully. Granett followed the letter to Stewart Madison with a letter of June 10, 1977, to James R. Madison, attorney for Sound/City, again specifying Soul's position with respect to rescission of the contract.

On June 21, 1977, Donald Passman advised Nems of Soul's position. Shortly

thereafter, the deal between Nems and Sound/City collapsed due to the dispute over Sound/City's right to release the recordings.

## CONCLUSIONS OF LAW

*Jurisdiction and Venue*

The parties being citizens of different states, the Court has subject matter jurisdiction over this action. The Court also has personal jurisdiction over the parties to the litigation and it is a court of proper venue.

*Rescission*

In the contract of August 16, 1969, the parties agreed that the rights and liabilities of the parties to the contract would be governed by California law:

"26. The validity, construction and effect of this agreement, and any and all extensions and/or modifications thereof, shall be governed by the laws of the State of California."

Sections 22 and 22.1 of the California Civil Code provide the basis for determining the law of California:

"22. Law is the solemn expression of the will of the supreme power of the State.

"§ 22.1. The will of the supreme power is expressed:

"(a) By the Constitution.

"(b) By statutes."

In addition, the California Civil Code adopts the rules of the common law of England, so long as those rules are not inconsistent with express statutory or constitutional provisions of California or the United States. Cal.Civ.Code § 22.2.

■ Sound/City and Soul entered into a bilateral contract, that is, a contract by which each party received a promise to do some act in exchange for his promise to do another act. Generally, one party to a bilateral executory contract may rescind the contract due to a substantial nonperformance or breach of his promise by the other party. *Sobelman v. Maier*, 203 Cal. 1, 262 P. 1087 (1927); *Haas v. Hodge*, 171 Cal.App.2d 478, 340 P.2d 632 (Cal.App.2d Dist. 1959). The California Civil Code provides the specific grounds for rescission of a contract:

"§ 1689(b) A party to a contract may rescind the contract in the following cases.

\* \* \* \* \* \*

"(2) If the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds."

California courts have long considered nonperformance or breach of a promise that is the consideration for a contract a failure of a consideration under California Civil Code § 1689(b)(2). *Medico-Dental Building Company of Los Angeles v. Horton & Converse*, 21 Cal.2d 411, 132 P.2d 457 (1942); *Crofoot v. Thompson*, 163 Cal.App.2d 324, 329 P.2d 302 (Cal.App.3d Dist. 1958); *Wilson v. Corrugated Kraft Containers*, 117 Cal.App.2d 691, 256 P.2d 1012 (Cal.App.2d Dist. 1953); *Loop Building Company v. DeCoo*, 97 Cal. App. 354, 275 P. 881 (Cal.App.2d Dist. 1929). To justify rescission, the breach or nonperformance of the promise must be so substantial and fundamental as to defeat the object of the parties in making the agreement. *Medico-Dental Building Company, supra; Hofland v. Gustafson*, 132 Cal. App.2d Supp. 907, 282 P.2d 1039 (Cal.App. Dept., Superior Court 1955); *Wilson v. Corrugated Kraft Containers, supra.*

If a party has grounds to rescind the contract, he must notify the other party of his intention to rescind, and he must offer to restore anything of value that he received under the contract. Cal.Civ.Code § 1691. The service of a pleading in an action or proceeding for rescission constitutes notice of rescission and an offer of restoration. *Id.* A party seeking rescission may bring his claim as a main demand or by defense or counterclaim. *Id.* § 1692.

■ The California Civil Code provides the remedy for a delay in notice or an offer to restore value received. A delay in giving notice does not deny the rescission remedy unless the adverse party has suffered substantial prejudice from the delay in giving notice. *Id.* § 1693; *Crofoot v. Thompson*, 163 Cal.App.2d 324, 329 P.2d 302 (Cal. App.3d Dist. 1958). Similarly, with respect to a delay in tender or restoration of value

received, California Civil Code § 1693 states:

"A party who has received benefits by reason of a contract that is subject to rescission and who in an action or proceeding seeks release based upon rescission shall not be denied release because of a delay in restoring or in tendering restoration of such benefits before judgment unless such delay has been substantially prejudicial to the other parties; but the court may make a tender of restoration a condition of its judgment."

The party granted rescission is entitled to a return of the consideration he gave for the contract. Cal.Civ.Code § 1692. The party against whom rescission is granted is entitled to a return of his consideration also. *Id.* § 1691. In addition, the Court ordering rescission may make equitable adjustments between the parties:

"If in an action or proceeding a party seeks relief based upon rescission, the court may require the party to whom such relief is granted to make any compensation to the other which justice may require and may otherwise in its judgment adjust the equities between the parties." *Id.* § 1692.

The Court also may make restoration or compensation a condition precedent to return of the thing the rescinding party contributed. *Id.* § 1693.

 Sound/City and Soul entered into a contract to make recordings, with both parties looking toward commercial reproduction. Sound/City agreed to release three singles and one album during the one-year term of the contract. The release of the recordings was a substantial and fundamental part of the contract. Without the release of recordings, neither Sound/City nor Soul could expect to gain anything from the contract. Sound/City breached its promise to release the recordings. The breach was so substantial and fundamental as to defeat the objective of the parties in making the contract.

As soon as Soul learned that Sound/City intended to release the recordings, he notified Sound/City that he considered the contract no longer valid. At that time, in early 1977, Sound/City had entered into no agreements with any party with respect to the release of the recordings. Moreover, negotiations with all interested parties still were in a speculative stage.

Because they were notified of Soul's position in early 1977, Sound/City suffered no substantial prejudice because Soul did not offer to restore any benefits he may have received under the contract. Indeed, Soul could not know the value of any contribution by Sound/City, because he had not received any sum of money from Sound/City in return for his services. The value of the goods and services rendered by Sound/City in the production of the recordings at issue in this case was not established until trial.

 In conclusion, under California law, Sound/City's breach of its obligation to release three singles and one album was so substantial and fundamental as to constitute a failure of consideration under Section 1689(b)(2) of the California Civil Code. Soul's notice of his intention to rescind the contract was timely, even though it occurred almost seven years after he knew or should have known about the facts giving rise to his right to rescind, because Sound/City suffered no substantial prejudice prior to receiving the letter from Donald Passman concerning Soul's position. Soul's assertion of rescission as a defense and counterclaim to this action is a sufficient tender of value to Sound/City because Sound/City suffered no substantial prejudice as a result of any delay in tender. Unless Soul's right to rescind has prescribed, Soul is entitled to rescission of the August 16, 1969, contract.

*Prescription*

 Statutes of limitation are procedural in nature; the limitation period of the forum state applies in an action in which state law provides the rule of decision. *Wright v. Fireman's Fund Insurance Company,* 522 F.2d 1376 (5th Cir. 1975), *reh. denied,* 526 F.2d 1407 (5th Cir. 1976). The Court must determine what statute of limitations, or prescriptive period, to use Louisi-

ana terminology, governs the instant action. It must decide what characterization a Louisiana court would give to this action if the action were brought in a Louisiana court, and if Louisiana substantive law governs the issues in the case.

The plaintiff claims that Louisiana Civil Code article 3542, with a prescriptive period of five years, governs the action, while the defendant claims that article 2221 governs, granting Soul ten years within which to bring his claim for rescission. Article 3542 deals with contracts that were void or voidable from their origin. Article 2221 concerns rescission due to a lack of capacity or due to a vice of consent, nullifying a contract as if it never existed. Both of the articles concern contracts that are defective from their beginning. The contract in question in this case was valid at its inception, being neither absolutely nor relatively null. Neither article 3542 nor article 2221 provides the prescriptive period for this action.

■ Louisiana does not follow the common law tradition that requires consideration to effect an enforceable contract. Rather, the mere will of the parties will bind them, without what a common law court would consider to be consideration to support a contract, so long as the parties have a lawful "cause". The cause need not have any economic value.

Louisiana's provisions on cause are derived from similar articles in the Code Napoleon. Professor J. Denson Smith described the role of cause in French law in an article written in 1951;

"In consequence of the fact that in French law a promisor can bind himself by his will alone, cause is merely concerned with his ' reason for doing so. There can be no such thing as a promise without a cause in civilian law in the sense that there can be a promise without consideration in Anglo-American law, for a manifestation of will must necessarily derive from some motive, reason, or grounds. Whereas consideration is something given for a promise, promise and cause are as inherently joined as the spoken word with the thought of creating it.

Hence the accurate identification of cause with motive." Smith, A Refresher Course in Cause, 12 La.L.Rev. 1, 4–5 (1951).

That Louisiana adopted the French theory of cause is clear from the definition of cause contained in Louisiana Civil Code article 1896:

"By the *cause* of the contract, in this section, is meant the consideration or motive for making it; and a contract is said to be without a cause whenever the party was in error, supposing that which was his inducement for contracting to exist, when in fact it had never existed, or had ceased to exist before the contract was made." (Emphasis in original.)

■ In this case, Soul's cause or motive to enter into the contract with Sound/City was his desire to gain financial reward and aesthetic recognition from the release of recordings. He would gain the reward and recognition by the release of the records by Sound/City. His cause or motive continued throughout the term of the contract. Therefore, there never was a failure of cause under Louisiana law. *See* La.Civ. Code arts. 1897–98.

■ Under Louisiana law, nonperformance of a promise constitutes a breach of an obligation, rather than a failure of cause or consideration. Civil Code article 1926 provides the remedy for breach of an obligation to do:

"On the breach of an obligation to do, or not to do, the obligee is entitled either to damages, or, in cases which permit it, to a specific performance of the contract, at his option, or he may require the dissolution of the contract, and in all these cases damages may be given when they have accrued, according to the rules established in the following section."

In a commutative contract, one in which the parties exchange mutual promises to do, nonperformance of a promise constitutes an implied resolutory condition, giving rise to an action to dissolve the contract. Civil Code articles 2045 and 2046 describe the effect of a resolutory condition:

"Art. 2045. The dissolving condition is that which, when accomplished, operates the revocation of the obligation, placing matters in the same state as though the obligation had not existed.

"It does not suspend the execution of the obligation; it only obliges the creditor to restore what he has received, in case the event provided for in the condition takes place.

"Art. 2046. A resolutory condition is implied in all commutative contracts, to take effect, in case either of the parties do not comply with his engagements; in this case the contract is not dissolved of right; the party complaining of a breach of the contract may either sue for its dissolution with damages, or, if the circumstances of the case permit, demand a specific performance."

■ An action to dissolve a contract due to breach of a promise or because the implied resolutory condition has occurred is *not* an action to rescind a contract under Louisiana law. Rescission, under Louisiana law, is the cancellation of obligations that flow from a contract that is absolutely or relatively null from its inception. Dissolution, on the other hand, is the cancellation of obligations that flow from a contract that is valid in all respects. Civil Code articles 3542 and 2221 concern only the remedy of rescission of absolutely or relatively null contracts. They do not govern an action for dissolution of a valid contract.

The parties do not dispute that the contract in question was valid when it was made. Sound/City had an obligation to do under the contract; that is, Sound/City was obligated to release three singles and one album containing recordings of performances by Soul between August, 1969, and August, 1970. Sound/City breached its obligation to do. Under Louisiana law, this action would be an action to dissolve the contract under article 1926 or article 2046.

■ The action to dissolve a contract for breach of an obligation to do prescribes in ten years. La.Civ.Code art. 3544; *Cyr v. Louisiana Interstate Gas Corporation*, 273 So.2d 694 (La.App. 1st Cir. 1973); *Southwestern Improvement Company v. Whit-*tington, 193 So. 483 (La.App. 1st Cir. 1940); cf. *Mid-States Homes, Inc. v. Davis*, 250 So.2d 836 (La.App. 4th Cir. 1971). *See Jackson v. Jones*, 14 La.Ann. 230 (1859). Soul sought his remedy of dissolution within ten years of the breach of the obligation by Sound/City. The action to dissolve the contract, or to rescind it under California law, has not prescribed.

Soul is entitled to rescission of the contract. The Court will make adjustments for the compensation or restoration due each party as a result of rescission. In granting rescission, the Court will make compensation of the value of the goods and services rendered to Soul by Sound/City a condition precedent to rescission of the contract.

*Accession*

■ Soul and Sound/City combined to make several things, recordings of performances by Soul. By contract, they could decide who would own the things they produced. The August, 1969, contract did provide for ownership of the recordings, but that contract now has been rescinded. Ownership of the recordings must devolve according to the law of accession. Because the recordings in question were made largely in Louisiana, Louisiana law shall govern the ownership of the recordings.

■ When two parties contribute goods and services to make a thing, and the materials and the services they provide create a new thing with an identity separate from the component parts, the process is called confusion. Louisiana Civil Code articles 528 and 529 provide the rules of accession when confusion occurs:

"Art. 528. When a thing has been formed by a mixture of several materials belonging to different proprietors, neither of which can be considered as the principal substance, if the materials can be separated, the proprietor, without whose consent the mixture was made, may demand the separation.

"If the materials can not be separated without inconvenience, their owners acquire in common the property of the

thing in proportion to the quantity, quality and value of the materials belonging to each of them.

"Art. 529. If the materials belonging to one of the proprietors, be far superior to the others, both in quantity and value, in that case the proprietor of the most valuable materials may claim the thing resulting from the mixture, on reimbursing to the other the value of his materials."

In this case, the separation of the component parts contributed by Sound/City and Soul is impossible. Article 528, however, is not entirely on point. One of the component parts, Soul's voice, clearly is the principal thing on the tape, as well as being far superior in value.

Article 522 defines the principal component:

"Art. 522. The part which is considered as principal, is that to which the other has been united only for the use, ornament or completion of the other.

"Thus the diamond is the principal part with reference to the gold in which it is set.

"The coat itself, with reference to the lace, lining and embroidery."

Soul's voice and performance are the only things that make the recordings in question unique and valuable. The contribution by the musicians and technicians is useful and ornamental, but it is David Soul's voice that makes a recording by David Soul valuable.

█ When one party has contributed the principal component to a thing, art. 521 of the Civil Code provides the principal of accession that applies:

"Art. 521. When two things belonging to different owners, and which have been united in such a manner as to form a whole, are nevertheless of a nature to be separated, so that one may exist without the other, the whole belongs to the owner of the thing which forms the principal part, under the obligation of reimbursing to the other the value of the thing which has been united to his own."

Because the contributions of the parties in this case are inseparable, article 521 does not apply on its face. However, article 529 reflects the principle as it applies to confu-

sion. Soul, having contributed the principal thing whose value far exceeds the value of Sound/City's contribution, owns the recordings, whether they are master recordings or demonstration recordings.

As Soul is the owner of the recordings, Sound/City must give them to him. Soul, of course, does owe Sound/City the duty to pay Sound/City the value it contributed to the recordings. The Court can determine the value of the contribution to Sound/City by adding the expenses of musicians, technicians, and travel to the recording studio rental in effect at the time the recordings were made. Sound/City spent $13,390 in connection with the recording sessions of Soul. Soul and Sound/City used 100 hours of studio time, which rented for $50 per hour during 1969–70. Their total contribution, therefore, was $18,390. In the deal with Famous Music, Sound/City received a net amount of $2,300 as a reimbursement for production costs for "The Road is Long" and "This Train". The $2,300 should be subtracted from the other amount to determine the contribution of Sound/City. Thus, Sound/City's contribution equaled $16,090.

### Conclusions

The Court has determined that Soul is entitled to rescind the August, 1969 contract. Once the contract is rescinded, Soul owns all recordings of his performances made for Sound/City. Under California law, a Court may condition the rescission of a contract on the payment of compensation by the party seeking rescission to the other party. The payment of $16,090 to Sound/City shall be a condition precedent to rescission of the contract and to the order requiring Sound/City to give the recordings of his performances to Soul. The Court will order that by April 1, 1978, Soul shall pay Sound/City $16,090. Upon the payment to Sound/City, the August 16, 1969 contract shall be rescinded and Sound/City shall give Soul all recordings made by Sound/City of Soul's performances.