[Civ. No. 25912. Second Dist., Div. One. May 21, 1962.]

LEO KANNER, Plaintiff and Appellant, v. NATIONAL PHOENIX INDUSTRIES, INC., Defendant and Respondent.

George Sokol for Plaintiff and Appellant.

David Hoffman for Defendant and Respondent.

FOURT, J.—This is an appeal by plaintiff from a judgment of nonsuit in an action for damages for breach of a contract of employment in which plaintiff was the employee. The cause was heard by the trial court sitting without a jury.

The plaintiff was the only witness called and at the conclusion of his case the trial judge granted defendant's motion for nonsuit.

This court must resolve every conflict in the testimony in favor of the plaintiff, consider every inference which can reasonably be drawn and every presumption which can fairly be deemed to arise in support of plaintiff, and accept as true all evidence adduced, direct and indirect, which tends to sustain plaintiff's case. (See *Coates* v. *Chinn*, 51 Cal.2d 304, 306-307 [332 P.2d 289].)

About six and a half months prior to the execution of the written agreement of employment plaintiff was employed by defendant as a *general manager*. Plaintiff testified that he "was in full charge of the entire operation, the bottling, the sales, advertising, public relations, personnel, and all phases of the operation."

The written agreement of employment was executed on January 29, 1958. It was incorporated by reference in plaintiff's complaint as "Exhibit 'A'" and provides in part as follows:

"I

"RECITALS

"1. Employer is a corporation conducting a multiple business and enterprises in its own name and through its subsidiaries, one of which is located in Southern California and engaged in the business of manufacturing and selling soft drinks in bottles and cans under various trade names, and is about to engage in other activities in connection with the distribution of beer and allied products such as wine. . . . The expression West Coast Operations when used herein shall

refer to said business only irrespective of the fact that Employer [i.e. defendant] may have other enterprises that are either located in or about Southern California or doing business therein.

"2. That although Employee [i.e. plaintiff] has been engaged by Employer prior to the execution of this agreement, all prior agreements between the parties hereto, oral or written, are hereby terminated and made void and replaced by the provisions herein contained.

"II

"SERVICES TO BE RENDERED BY EMPLOYEE .

"1. Employee is to be the *general manager* of West Coast Operations *as long as same is operating at a profit.*

"2. .      .      .      .      ." (Emphasis added.)

"III

"DURATION

"1. The effective date of the commencement of the employment term shall be February 1, 1958, *and shall continue for a period of five (5) years thereafter."* (Emphasis added.)

The written employment agreement further specified the salary; contained a provision for sharing of profits; and set forth the terms of a stock option.

Appellant states in his opening brief that "the sole question on this appeal is the correct legal interpretation of the contract. . . ." Specifically, the problem of interpretation centers around paragraphs II and III of the employment agreement.

Subsequent to the execution of the employment agreement, plaintiff and defendant executed an agreement which modified the agreement of January 29, 1958, in part. This modifying agreement dealt with the matter of options to purchase stock.

Commencing May 1, 1959, by mutual agreement, plaintiff's salary was reduced. He received the reduced salary until his employment was terminated on November 30, 1959.

Plaintiff testified that he knew that defendant was "losing money after I had joined their [*sic*] company, prior to the agreement." The evidence was uncontradicted that the West Coast Operation never made a profit. Plaintiff further testified that Mr. Mack, defendant's president, had frequently written during 1958-1959 expressing concern over the fact that the West Coast Operation was continuing to lose money.

It is conceded that the sole basis for granting the nonsuit was the evidence to the effect that no profit was made.

Plaintiff's counsel argued in opposition to the motion for nonsuit and stated in pertinent part:

"The contract, according to the way I read it—and I am trying to read it as fairly as I can, even though I am the advocate for the plaintiff—indicates an employment contract. *First of all, he is an employee. That is what he was hired to be, an employee. The provision that counsel refers to, that he is to be the general manager of the West Coast operations as long as there is a profit [i.e. paragraph 11] only has to do with his being called the general manager. That is my construction of the contract.*" (Emphasis added.)

Appellant's first contention here is that the trial court erred in interpreting the contract. Appellant asserts that the "more reasonable and proper construction is that plaintiff was to be employed in *some* capacity for a period of five years and that the profit requirement was intended by both parties to be applicable only to the title or position he held and the salary he was to be paid." (Italics shown.)

The argument is predicated upon the premise that paragraphs II and III are ambiguous and inconsistent with each other. ▮▮▮ As heretofore set forth, paragraphs II and III provide in pertinent part as follows:

## "II

### "Services to Be Rendered by Employee

"1. Employee is to be the *general manager* of West Coast Operations *as long as same is operating at a profit.*

"2.    .    .    .    .    .    .    .    .    ..

## "III

### "Duration

"1. The effective date of the commencement of the employment term shall be February 1, 1958, *and shall continue for a period of five (5) years thereafter.*" (Emphasis added.)

It is fundamental that a contract must receive an interpretation which will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties. (Civ. Code, § 1643.)

▮▮▮ What was stated in *Pico Citizens Bank* v. *Tafco Inc.,* 165 Cal.App.2d 739 [332 P.2d 739], is applicable to the case here. Therein it was stated at page 749:

"Finally respondent contends that inasmuch as the agree-

ment was prepared by the defendant any ambiguity or uncertainty therein should be interpreted most strongly against it. This is undoubtedly the rule where the language is ambiguous or subject to different interpretations, but '(n)o term of a contract is either uncertain or ambiguous if its meaning can be ascertained by fair inference from the other terms thereof.' (*Bondy* v. *Phoenix Indemnity Co.* (1953) 116 Cal.App.2d 702, 704 [254 P.2d 148].) Such we believe is the situation here.''

Appellant's contention is without merit. The trial court's construction of the agreement is consistent with plaintiff's testimony. Plaintiff was made general manager prior to the signing of the agreement and was in full charge of the entire operation at the Los Angeles plant. He was aware that defendant was losing money in its operations but believed that by adding a beer distributing line the operations could become profitable and plaintiff so expressed this belief to Mr. Mack, defendant's president. At the time of the signing of the employment agreement he told Mr. Mack that he could make a profitable operation of the business.

We believe that paragraphs II and III are neither ambiguous nor inconsistent. On the contrary, in the words of the trial judge:

''Now, this provision under Paragraph II is a very simple provision. It is thoroughly logical. It is not only logical, but it is thoroughly sensible, and it specifically says that the employee shall be the general manager of the West Coast operations as long as same is operating at a profit. Now, that is just another way of saying that in the event the operations shouldn't be proceeding at a profit, the right of discharge would exist. When we take that provision in connection with the provision of Paragraph 1 of main Section III, we simply have this result: That at the most, whether or not the institution was going at a profit or not, the plaintiff had an agreement fixing his term up to February 1st 1963, but this basic provision referring to the operation as being profitable or not profitable is a primary, fundamental provision of the employment. It is very clear. In my opinion, it couldn't reasonably be misinterpreted.''

Appellant's next contention is that the provision with reference to the making of a profit ''was waived by defendant by its retention of plaintiff for a period of over a year while no profit was being made and by its conduct in accepting his

services under modifications of the original agreement.'' The position cannot be sustained. First, there was no issue of waiver before the trial court. The question of waiver was not pleaded nor set forth in the pretrial conference order. The issues as set forth in the pretrial conference order are as follows:

''(1) Did plaintiff perform all of the terms and conditions of the agreement of January 29, 1958, as modified.

''(2) Was plaintiff discharged or did he resign.

''(3) If plaintiff was discharged, was he discharged for cause.

''(4) Does the provision in the agreement of January 29, 1958, providing that employee is to be the general manager of the West Coast operations as long as same is operating at a profit mean that if the West Coast operations are not operating at a profit after a reasonable period of time, that defendant would have the right to discharge plaintiff.

''(5) Did the agreement of May 12, 1958, modify and supersede the agreement of January 29, 1958, with reference to stock options.

''(6) Was plaintiff at any time after May 12, 1958, and until the time of his discharge or resignation entitled to exercise any options.

''(7) Did plaintiff devote his entire time, effort and energy and his skill, labor and attention to his employment or did he neglect many of his duties.

''(8) Did plaintiff wilfully disobey reasonable orders of the defendant.

''(9) Did plaintiff authorize improperly payments to himself of funds of the defendant.

''(10) Did plaintiff, in direct contravention of the orders of defendant, extend credit to certain individuals and/or groups of customers as a result of which defendant suffered credit losses in excess of $8,000. If so, is defendant entitled to damages against plaintiff in such sum.

''(11) Plaintiff's damages, if any.

''(12) Defendant's damages, if any.''

Secondly, there is no substantial evidence in the record to support a determination that defendant waived the ''profit'' provision of the contract. Plaintiff's own testimony shows that the parties during most of the first 10 months of plaintiff's employment believed that there was a profit shown, but that after a review of the accountant's figures, it was dis-

closed that there were losses instead. Plaintiff testified in pertinent part as follows:

"Q.: In the early part of 1958 you had an accountant by the name of Sam Leibowitz; isn't that correct? A.: That is correct.

"Q.: And he was hired by you for National Phoenix; isn't that correct? A.: Well, he was brought in the company by me, but he wasn't officially hired and made our CPA or accountant in fact until Mr. Mele came out and interviewed him and approved him.

"Q.: In other words, you brought him in. A.: I brought him in.

". . . . . . . . . . . . .

"Q.: BY MR. HOFFMAN: Now, Mr. Kanner, during the time that Mr. Leibowitz was the CPA in the local operations, the West Coast operations, things got pretty badly muddled; isn't that correct? A.: *That came out in December of 1958 that his records were pretty badly muddled.*

". . . . . . . . . . . . .

"Q.: Now, late in the year 1958 on one of Mr. Mele's trips out here, in checking through the books, he found that there were some errors made by the auditor that raised some question about whether or not there were profits; isn't that correct? A.: That is correct.

"Q.: And as a result of that, Mr. Leibowitz was discharged and the accounting firm of Hinckle and Hinckle was employed to make a new audit. A.: That is correct.

"Q.: And as a result of the new audit, it disclosed that actually during the year 1958 there was substantial loss. A.: Well, it showed an entirely different picture than I had been led to believe had existed.

"Q.: And subsequently, Mr. Kanner, after this was brought to the attention of Mr. Mack, Mr. Mack wrote you in December. A.: December.

"Q.: In December of 1958, expressing some alarm, and then of course you made the trip back to New York to discuss the matter with him. A.: That is correct.

"Q.: Now, going into the year 1959, sometime in the spring, Mr. Mack again started writing you letters expressing some alarm at the losses that were being reported monthly; isn't that correct?"

As stated in 51 California Jurisprudence 2d, Waiver, section 8, page 318: "The burden is on the party claiming a

waiver to prove it by evidence that does not leave the matter doubtful or uncertain.''

There was no evidence that plaintiff believed that the profit provision was waived because of any conduct of the defendant.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 18, 1962.