[Civ. No. 32820.  Second Dist., Div. Five.  Nov. 25, 1969.]

JAMES HAWKINS, Plaintiff and Appellant, v.
RUBY M. YORK, Defendant and Respondent.

COUNSEL

Kelley & Clark and Stanley D. Clark for Plaintiff and Appellant.

Burton, Gauldin, Thomson & Nelson and R. Jackson Gauldin for Defendant and Respondent.

OPINION

**STEPHENS, Acting P. J.**—Plaintiff appeals from a judgment for defendant Ruby York in an action to quiet title to certain real property.

In August 1937 plaintiff owned a parcel of real property located in Whittier, California. On August 2, 1937, he entered into an agreement with defendant and her husband Victor York. Under the agreement plaintiff transferred the property to the Yorks as joint tenants. In exchange, the Yorks promised to pay plaintiff $200 per month until he died and agreed not to sell or encumber the property during plaintiff's lifetime. The Yorks were given the right to reconvey the realty to plaintiff at any time and thereby terminate all their obligations under the agreement.

Before executing the agreement, plaintiff leased part of the property to The Texas Company for use as a service station. This lease was in effect when plaintiff and the Yorks entered into their agreement. Beginning in

1939 the Yorks leased various portions of the property to third parties. One of these leases was entered into with The Texas Company and was joined in by plaintiff. All told, the Yorks entered into no less than six leases without plaintiff's express consent. At least two of this number were in existence at the time of trial.

Victor York died in 1963. The parties stipulated that the Yorks, and after Victor's death defendant, caused $200 to be paid to plaintiff each month from September 1, 1937, to the date of trial. These payments totaled in excess of $70,000. At no time before trial did the Yorks exercise their termination rights under the agreement.

On February 8, 1966, nearly 29 years after he had signed the agreement, plaintiff notified defendant that he considered her in default of her obligations under the agreement since, he asserted, she had permitted the property to become encumbered. Plaintiff declared in the notice that if defendant did not remove the encumbrances within 10 days he would enforce his "rights of reversion." Nine days later plaintiff advised defendant that he considered the agreement void for lack of mutuality since defendant, he alleged, could cancel it at any time "without liability."

When defendant failed to comply with the demand to remove encumbrances, plaintiff brought this quiet title action. As in his notices to defendant, at trial plaintiff complained: (1) that the agreement was void for lack of mutuality and consideration, and (2) that the defendant had breached the agreement by encumbering the property. The second claim he based on the fact that the Yorks had leased the parcel to various third parties, and that two of theses leases were still in effect. Having lost below, plaintiff advances the same two contentions on appeal. We are in accord with the trial court and find that both arguments lack merit.

We set portions of the agreement forth at this point so that the context of our determination of the issues be clear:

"GRANT DEED

and

AGREEMENT

"THIS AGREEMENT, made and entered into this 2d day of August, 1937, by and between JAMES HAWKINS, a single man, of the County of Los Angeles, State of California, hereinafter sometimes called party of the first part and VICTOR H. YORK and RUBY M. YORK, husband and wife, of the County of Los Angeles, State of California, hereinafter sometimes called parties of the second part.

"W I T N E S S E T H :

"WHEREAS, the party of the first part is the owner of that certain real property hereinafter described and is desirous of transferring the same to the parties of the second part upon the terms and conditions hereinafter set forth.

"NOW, THEREFORE, it is understood and agreed that subject to the terms and conditions hereof, the said parties of the second part hereby agree to pay to the party of the first part, so long as the party of the first part shall live, the sum of Two Hundred ($200.00) Dollars per month, payable monthly in advance, commencing September 1, 1937.

"For and in consideration of the covenants and agreements herein contained, the said James Hawkins hereby grants to Victor H. York and Ruby M. York, husband and wife as joint tenants, all that real property in the City of Whittier, County of Los Angeles, State of California, described as:

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Subject . . . to conditions, reservations, restrictions, and rights of way, if any, of record. Subject also to lease executed by James Hawkins a single man to The Texas Company, a corporation, dated January 10, 1937.

"It is understood and agreed that the parties of the second part shall be, and they are hereby restrained from selling and/or encumbering said premises for and during the life of the party of the first part; provided that the existing Federal income tax lien now of record against the parties of the second part, or either of them, shall not be deemed to be an encumbrance within the meaning of this paragraph.

"It is understood and agreed that the parties of the second part shall have the right at any time hereafter during the life of the party of the first part to convey said premises to the party of the first part by good and sufficient grant deed thereof accompanied by a title certificate of a title company operating in Los Angeles County, California, showing said premises at the time of said reconveyance to be free and clear of all liens and encumbrances other than those existing at the date hereof; provided that leases of said premises shall not be deemed to be encumbrances within the meaning of this paragraph. Upon the execution of said conveyance by parties of the second part to the party of the first part, the parties of the second part shall thereupon be relieved of all further obligations hereunder accruing or to accrue after the date of said conveyance.

"It is understood and agreed that upon a breach of any of the foregoing

covenants and agreements hereinabove set forth to be by the parties of the second part performed, and the same not having been by the parties of the second part cured within (10) days after written notice thereof to them by the party of the first part, said premises shall ipso facto revert to the said grantor, his heirs and assigns and that said grantor shall thereupon have the right of immediate re-entry upon said premises in the event of such breach and failure to cure the same as herein provided.

"It is further understood and agreed that proof of performance of the covenants and agreements herein provided to be performed by the parties of the second part may be made by recording a certified copy of the death certificate of the party of the first part, together with a cancelled bank check marked paid, covering payment due by the parties of the second part to the party of the first part on the 1st day of the month during which the death of the party of the first part occurred.

"WITNESS our hands this 2d day of August, 1937.

"James Hawkins

Party of the First Part

Victor H. York

Ruby M. York

Parties of the Second Part"

Plaintiff claims that the Yorks' promise to pay him $200 per month was illusory. He predicates his argument on what we think is an erroneous interpretation of the termination provision of the agreement. The portion of the provision upon which he relies reads as follows: "Upon the execution of said conveyance by parties of the second part [the Yorks] to the party of the first part [plaintiff], the parties of the second part shall thereupon be relieved of all further obligations hereunder accruing or to accrue after the date of said conyevance." Plaintiff contends that this language allows the Yorks, by reconveying the property to plaintiff, to avoid paying plaintiff the $200 monthly installments accruing both *before* and after the reconveyance, not merely those accruing after reconveyance.

The quoted portion of the agreement is ambiguous. The problem is whether the phrase "after the date of said conveyance" was meant to modify the expression "accruing or to accrue," or just the words "to accrue." The trial court correctly admitted extrinsic evidence of the circumstances under which the instrument was executed. (*Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641]; *Estate of Russell* (1968) 69 Cal.2d 200, 210-212 [70 Cal.Rptr. 561, 444 P.2d 353]; *United States Leasing Corp.* v. *du Pont* (1968) 69 Cal.2d 275, 284 [70 Cal.Rptr. 393, 444 P.2d 65];

*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 522 [67 Cal.Rptr. 761, 439 P.2d 889]; *Davidson* v. *Welch* (1969) 270 Cal.App.2d 220, 231-232 [75 Cal.Rptr. 676].) ■ The extrinsic evidence introduced was not conflicting, and the court made no finding as to the meaning of the language in question. Therefore, this court must make an independent interpretation of the language, in light of the entire instrument and the extrinsic evidence adduced below. (*Parsons* v. *Bristol Dev. Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839]; cf. *Pierpont Inn, Inc.* v. *State of California* (1969) 70 Cal.2d 282, 294 [74 Cal.Rptr. 521, 449 P.2d 737]; *Miller* v. *Citizens Sav. & Loan Assn.* (1967) 248 Cal.App.2d 655, 660-661 [56 Cal.Rptr. 844].)

■ We have concluded that it is more consonant with the spirit of the agreement and the circumstances of the parties to interpret the language as allowing the Yorks, by reconveying to plaintiff pursuant to the termination clause, to escape from paying him only those installements which would accrue *after* such reconveyance. The evidence demonstates that plaintiff's major objective in signing the agreement was to obtain "security for life." Plaintiff understood that under the agreement he had a right to receive $200 per month for the rest of his life, or until the Yorks reconveyed the property. There is evidence that he looked upon the agreement as sort of a "lease" which would give him the security he sought.[1] Since plaintiff thought in such terms, it seems unreasonable to conclude that he would agree to an arrangement allowing the Yorks to hold the property without paying the $200 monthly "rent" which would accrue during their occupancy particularly in light of the words "all further obligations" thus speaking to the future. Our interpretation is buttressed by the language of the paragraph following the termination provision, which language provides that if the Yorks default on their promises the property reverts to plaintiff. The agreement throughout appears to envision that plaintiff should receive $200 per month or get his property back.

As we have construed the agreement, there was sufficient consideration flowing from the Yorks to plaintiff to support a contract. By the instrument's terms defendant and her husband could choose between two alternatives: to keep the property and pay plaintiff, so long as he lived, $200 per month; or to reconvey the property to plaintiff having paid plaintiff at the rate of $200 per month for the term of their occupancy.

---

[1] Defendant testified that before the signing of the agreement her husband told plaintiff that he would get $200 per month for the remainder of his life. She also testified that, when she inquired of her husband why they were not just buying the property outright, plaintiff interjected: "That is just the way I want it. The *lease* is just the way I want it. I want security." (Italics added.)

Certainly the obligation to make the monthly payments was a benefit to plaintiff and a detriment to the Yorks.

The Yorks' right to terminate the agreement was by no means unqualified. If they elected to cease performance, they were required, as a condition precedent to termination, (1) to reconvey the property to plaintiff by executing and delivering a grant deed, and (2) to secure and deliver to plaintiff a title certificate showing the property to be free and clear of all liens and encumbrances other than those existing at the date of the agreement. The delivery of a deed and a title certificate would serve to notify plaintiff of termination. Although the cases are more clear where a specified period of notice is required by the agreement (*Brawley* v. *Crosby etc. Foundation, Inc.* (1946) 73 Cal.App.2d 103, 113-118 [166 P.2d 392]), this court recently held that the requirement to notify of termination is a significant qualification of the option to cease performance, even without a time lapse between notification and termination. (*Millgee Inv. Co.* v. *Friedrich* (1967) 254 Cal.App.2d 802, 805-806 [62 Cal.Rptr. 730]; see alsc 1A Corbin, Contracts, § 163, pp. 76-83.) Moreover, by delivering plaintiff a grant deed, the Yorks would be personally covenanting to him that they had never conveyed the property to a person other than plaintiff, and that the property at the time of reconveyance was free from encumbrances imposed by them or by any person claiming under them. (Civ. Code, § 1113; 2 Witkin, Summary of Cal. Law (1960) Real Property, § 34, pp. 890-891.) We think the Yorks' right to terminate the agreement, as thus conditioned, does not render illusory their promise to pay plaintiff $200 a month for the rest of his life.

Nor can the Yorks, pursuant to the paragraph following the termination clause, escape their obligations under the termination clause merely by failing to pay plaintiff $200 per month or by encumbering the property. First, the Yorks could not, unilaterally, cause the reversion of title to plaintiff. Title reverts only after plaintiff has elected to invoke the default provision by giving written notice of the default. Moreover, the only way the default provision would allow the Yorks to avoid their obligations under the termination clause is if the former is interpreted to allow the Yorks to *terminate* the agreement by defaulting. Such a construction would render the termination clause superfluous. And we are bound to give effect to every provision of the agreement, if reasonably practicable. (Civ. Code, § 1641; *Universal Sales Corp.* v. *California Press Mfg. Co.* (1942) 20 Cal.2d 751, 760 [128 P.2d 665]; *Alperson* v. *Mirisch Co.* (1967) 250 Cal.App.2d 84, 90 [58 Cal.Rptr. 178].)

Plaintiff's second contention—that the Yorks breached the contract by encumbering the property, is also based upon a misconstruction of

the agreement. The language involved here reads as follows: "It is understood and agreed that the parties of the second part [the Yorks] shall be, and they are hereby restrained from selling and/or encumbering said premises for and during the life of the party of the first part [plaintiff]; provided that the existing Federal income tax lien now of record against the parties of the second part, or either of them, shall not be deemed to be an encumbrance within the meaning of this paragraph." Plaintiff argues that the term "encumbrance" as used in the quoted paragraph includes all leases of the property granted without his consent. We disagree.

■    We recognize that a lease may ordinarily be considered to be an encumbrance. (See e.g., *Evans* v. *Faught* (1965) 231 Cal.App.2d 698, 710-711 [42 Cal.Rptr. 133]; *Mann* v. *Montgomery* (1907) 6 Cal.App. 646, 648 [92 P. 875].) But parties to a contract have a right to exclude what they wish from the ambit of any term which they use in their agreement.

‹    ■    Plaintiff correctly points out that any ambiguities in the provision in question should be construed most strongly against defendant, since it was the Yorks' lawyer who drafted the agreement. (Civ. Code, § 1654; *Laux* v. *Freed* (1960) 53 Cal.2d 512, 524 [2 Cal.Rptr. 265, 348 P.2d 873]; *Taylor* v. *J. B. Hill Co.* (1948) 31 Cal.2d 373, 374 [189 P.2d 258]; *Estate of Rule* (1944) 25 Cal.2d 1, 13 [152 P.2d 1003, 155 A.L.R. 1319].) But no term of a contract is uncertain or ambiguous if its meaning can be ascertained by fair inference from the other terms of the agreement. (*Pico Citizens Bank* v. *Tafco, Inc.* (1958) 165 Cal.App.2d 739, 749 [332 P.2d 739]; *Kanner* v. *National Phoenix Industries, Inc.* (1962) 203 Cal. App.2d 757, 760-761 [21 Cal.Rptr. 857].)    ■    And, in the case at bench, the meaning of the term "encumbrance" can be determined from the context in which it appears. The termination provision expressly states that for purposes of that paragraph ". . . leases of said premises shall not be deemed to be encumbrances. . . ." Since plaintiff thereby permitted the vendees to reconvey the property subject to leases, it seems illogical to suggest that the preceding paragraph forbids the Yorks from leasing the property during their occupancy.[2]

The most persuasive evidence against plaintiff's interpretation of the instrument is furnished by the conduct of the parties in the 28 years after the agreement was executed. The trial court found, and there is ample evidence to support the finding, that during most of this time plaintiff was

---

[2]If the term "leases," as used in the termination paragraph is taken to mean only leases in existence at the execution of the agreement, we could logically conclude that the word "encumbrances," as used in the provision in question, includes subsequent leases of the property. Such an interpretation, however, would render the termination provision redundant.

aware that the property had been leased to various third parties for the operation of business enterprises. Despite this knowledge, plaintiff at no time prior to 1966 complained to the Yorks of the leases. We think that plaintiff's apparent acquiescence in the Yorks' repeated leasing of the subject property demonstrates that the parties interpreted their own agreement as permitting the Yorks to lease the property as they pleased during their occupancy. (Cf. *Wilson* v. *Corrugated Kraft Containers, Inc.* (1953) 117 Cal.App.2d 691, 694-695 [256 P.2d 1012]; *Crestview Cemetery Assn.* v. *Dieden* (1960) 54 Cal.2d 744, 752-755 [8 Cal.Rptr. 427, 356 P.2d 171].)

The judgment is affirmed.

Aiso, J., and Reppy, J., concurred.

A petition for a rehearing was denied December 9, 1969, and appellant's petition for a hearing by the Supreme Court was denied January 21, 1970.