[Civ. No. 11863. Fourth Dist., Div. Two. Dec. 13, 1972.]

In re the Marriage of ANNABELLE LOWRY and
RALPH LEE WILLIAMS.
ANNABELLE LOWRY WILLIAMS, Respondent, v.
RALPH LEE WILLIAMS, Appellant.

## COUNSEL

Ellis J. Horvitz for Appellant.

Rutan & Tucker and Richard A. Curnutt for Respondent.

## OPINION

**KERRIGAN, J.**—The appellant, Ralph Lee Williams, and the respondent, Annabelle Lowry Williams, were married on March 9, 1957, and separated on September 4, 1969. Two children were born as issue of the marriage: James on March 4, 1959, and Katherine on September 9, 1963. At the time of the marriage, Ralph was a young auto salesman with assets of less than $5,000. At the time of the separation, the parties were millionaires as the result of Ralph's success in acquiring and operating various business enterprises, primarily auto agencies.

On September 5, 1969, Annabelle filed a complaint for separate maintenance or divorce. When an attempted reconciliation failed, Ralph was extremely desirous of effecting a property settlement inasmuch as the success of his business operations depended on maintaining lines of credit

with major lending institutions and the pendency of the action would naturally tend to impair his credit standing. In any event, the parties entered into serious settlement negotiations, both directly and through their respective counsel, which culminated in the execution of a marital settlement agreement on November 15, 1969, in which Annabelle transferred the bulk of the community estate to Ralph in exchange for a handsome alimony allowance.

In September 1970, while the dissolution action was still pending, Annabelle changed attorneys and moved to amend her complaint to have the property settlement agreement of November 15, 1969 invalidated on the grounds of fraud, undue influence and coercion. The motion to amend was apparently granted.[1] A supplemental complaint (petition) was filed. Subsequently an amendment to the supplemental petition was also filed charging Ralph with negligent misrepresentation as a further ground for setting aside the property settlement agreement.

Following a lengthy trial, the court issued its tentative opinion (memorandum of decision) wherein it ruled that: (1) the property settlement agreement was valid and rescission was denied; (2) certain community assets listed in the financial statement attached as Exhibit 1 to the agreement had been undervalued by Ralph; (3) said undervaluations were neither willful nor fraudulent;[2] (4) nevertheless, Ralph had expressly warranted in the agreement to compensate Annabelle for one-half of the value of any undisclosed assets as well as any undervalued community assets transferred to him by Annabelle; (5) said undisclosed and undervalued assets totalled $614,021.95; and (6) therefore, Annabelle was entitled to a monetary award of $307,010.97.

Ralph's trial counsel failed to request findings of fact and conclusions of law within the time authorized by law. (Code Civ. Proc., § 632; Cal. Rules of Court, rule 232.) Judgment was entered dissolving the marriage, approving the agreement, and awarding Annabelle an additional $307,000.

Ralph appeals from that portion of the judgment relating to the largest item of undervaluation, to wit, certain shares of Coast Standard Life Insurance Company stock which were given a "cost basis" and "carrying value" of $70,000 in the body of the financial statement incorporated in the agreement but which the court determined had a fair market value

---

[1] No minute order or formal order was ever made expressly authorizing the amendment but the omission is immaterial inasmuch as the validity of the property settlement agreement was the crucial issue at trial.

[2] During the trial, Annabelle's counsel stipulated that the undervaluations involved herein were neither willful nor fraudulent on Ralph's part.

of $471,080, and which resulted in Annabelle receiving a recovery of $200,540 ($471,080 − 70,000 = $401,080—½ of $401,080 = $200,-540) representing the major part of the $307,000 award.

Ralph raises the following issues on appeal: (1) The trial court erred as a matter of law in awarding Annabelle over $200,000 for the purported undervaluation of the Coast Standard Life Insurance Company stock inasmuch as he made a full disclosure of the actual fair market value of the stock to Annabelle before the execution of the marital settlement agreement as well as in the agreement itself; (2) the trial court erred in excluding certain hearsay testimony; and (3) the trial court erred as a matter of law by directing him to compensate Annabelle in *cash* for good faith undervaluation of assets, rather than permitting him the alternative of compensating her in *kind*.

Resolution of the issues involves an understanding of the background of the negotiations which led up to the settlement, as well as an analysis of the agreement itself.

At the time of the parties' separation in September 1969, Ralph's five dealerships were experiencing some financial difficulty. His agencies were dependent upon his ability to maintain lines of credit with major financial institutions such as Bank of America and Ford Motor Credit Company. He pushed for an early property settlement as a result of fear that the pending divorce would jeopardize his sources of money and ruin his business enterprises. Although Annabelle had an attorney, Milan Dostal, Ralph contacted her personally on numerous occasions following the separation and they tentatively agreed Ralph needed most of the community property to finance the community enterprises and that Ralph should receive practically all of the business assets in order to continue to operate the businesses. In exchange, Annabelle was to receive the Newport Beach residence plus $3,000 a month in alimony for a minimum of 10 years even if she remarried, and for life if she did not. Ralph agreed to carry a million-dollar policy of life insurance in Annabelle's favor to protect her and the children in the event of his death.

During the course of the personal negotiations between Ralph and Annabelle, Ralph was seriously concerned about the amount of her attorney's fee. Annabelle told Ralph that Dostal had quoted her a fee of $50,000-$75,000. Ralph felt the fee was exorbitant and told Annabelle to terminate Dostal. On November 4, 1969 and November 5, 1969, Annabelle sent letters to Dostal instructing him to do *no* more work. Dostal diplomatically replied that he was working on the marital settlement

agreement. But the conclusion is inescapable that just before the execution of the agreement, Annabelle had lost confidence in her attorney and did not trust him.

Nevertheless, the formal agreement was negotiated between Annabelle's attorney and Ralph's attorney with the assistance of Karl Waegele, a certified public accountant who was also an officer of Ralph's firms. Waegele prepared a personal financial statement of the parties' assets as of August 31, 1969. He transmitted this statement to Ralph's attorney. The accountant and the two attorneys had at least three meetings. Thereafter, Annabelle's attorney conferred with her regarding each of the items on the financial statement. When her attorney recommended an audit be made of all the assets, Annabelle told Dostal not to have an independent audit because she did not want to disrupt the business enterprises and upset Ralph. Further reasons for Annabelle not wanting an audit may be capsulized as follows: (1) She trusted the CPA, Mr. Waegele; (2) the fair market value of the parties' assets could vary by honest opinion; (3) most of the assets were subject to audit by independent agencies such as the Internal Revenue Service and the Ford and Chrysler Motor Companies; and (4) her attorney came up with the idea that certain remedies (warranties) could be built into the settlement contract itself to cover any misrepresentations regarding values and any undisclosed assets.

The financial statement prepared by Ralph's accountant was incorporated in the marital settlement agreement as Exhibit 1. It shows total community assets of $2,148,225.26 and total community liabilities of $773,838.04—a net worth of about $1,375,000. Aside from the Newport Beach residence, furniture, furnishings, appliances and personal items having a total value of approximately $360,000, Ralph received the bulk of the community assets and agreed to pay Annabelle $3,000 a month alimony.

The agreement recites that Ralph furnished financial statements and income tax returns to Annabelle for the purpose of dividing the community property of the parties and that Annabelle and her attorney relied thereon without resorting to discovery proceedings at Ralph's request in order that there be an early, amicable, and expeditious settlement.

The trial court apparently based its monetary award on the following express provisions of the agreement:

"B. *Warranty by Husband*

"Wife, and counsel for wife, have been supplied by husband with financial statements and income tax returns for the purpose of dividing

the community property of the parties and wife, and counsel for wife, have relied thereon. *Wife enters into this Agreement without resorting to any discovery proceedings permitted by law at the specific request of Husband that an early, amicable, and expeditious settlement of the matters covered hereby be obtained* and specifically does not, by the execution of this instrument, waive the benefit of any fiduciary obligation on the part of husband to make a full and complete disclosure of the nature and extent of the community property to her. Wife has fully relied on the representation of husband that all the property in which husband has any interest, whether separate or community, is specifically referred to herein and has refrained from any investigation of the nature or extent of husband's estate.

*"Husband warrants and represents to wife that all of the separate, community, and jointly held property of the parties is set forth in Exhibit 1 attached hereto and incorporated herein by reference. Husband further warrants and represents to Wife that he has disclosed the true value thereof.* Husband further warrants and represents to Wife that he has no separate property and there is no community or jointly held property of the parties other than as has been disclosed in the attached Exhibit 1. . . . *If additional property held by husband is uncovered in the future, or if the values placed on properties retained by husband should prove to be understated, . . . then husband shall forthwith, and upon demand of Wife, pay over to Wife one-half (½) of the additional value of such after-discovered property in kind, or one-half (½) the value of such after-discovered property in cash . . . .* This paragraph shall be deemed to be an 'executory' provision of this Agreement, and a material inducement to Wife to execute this Agreement." (Italics supplied.)

The interest of the parties in the Coast Standard Life Insurance Company was listed in the body of the financial statement (Exhibit 1) as having a "cost basis" and "carrying value" of $70,000 as of August 31, 1969. However, a footnote to the statement of assets and liabilities reads as follows:

"Coast Standard Life Insurance Company recently exchanged substantially all it's [*sic*] assets for 67,297 shares of the capital stock of Founders Life Insurance Company, plus a right to receive an additional 59,350 shares over a five year period contingent upon the amount of insurance premium sales specified in the related agreement.

"Sale of the above mentioned stock is prohibited, by terms of the agreement, for a period of five years. *A 70% share of the stock [the parties'*

*interest in Coast] presently in possession of Coast Standard Life Insurance Company amounts to 47,108 shares, with a current market value of $471,-080.00.*

"No recognition of the additional shares mentioned above is given at this time, inasmuch as future performance will determine if any such shares are delivered to Coast Standard Life Insurance Company." (Italics added.)

As indicated above, Ralph and Annabelle owned a 70 percent interest in Coast Standard Life Insurance, with the balance of 30 percent being owned by Ralph's accountant, Karl Waegele, and a third party.

The court determined that Annabelle was entitled to a total recovery of $307,010.97 on the following basis:

| Description | Represented Value | Actual Value | Undervaluation or After Discovered Value |
|---|---|---|---|
| Banner Life Stock Sale | (Not listed in Financial Statement) | | $ 21,500.00 |
| No. Hollywood Apartments | $200,000.00 | $275,000.00 | 75,000.00 |
| Clovis Property (Commercial Bldg.) | 403,080.47 | 500,000.00 | 96,919.53 |
| Linda Isle Lot 37 | 65,477.58 | 85,000.00 | 19,522.42 |
| Coast Standard Stock | 70,000.00 | 471,080.00 | 401,080.00 |
| | | | $614,021.95 |

Ralph's accountant had not listed the Banner Life Stock in Exhibit 1. As to the remaining items listed above, there had been an understatement of value and the court, therefore, awarded Annabelle one-half of the undervaluation or undisclosed value—$307,010.97.

RECOVERY FOR UNDERVALUATION OF COAST STANDARD STOCK

Ralph admits that he may not attack the finding of fact, implied in the judgment, that the Coast Standard stock had a value of $471,080 as of November 15, 1969, the date the marital settlement agreement was exe-

cuted.[3] His position is that the precise value found by the court was revealed to Annabelle, both during negotiations for the settlement and in the footnote of the financial statement embodied in the settlement agreement itself; that by disclosing the value in this way he fulfilled his fiduciary duty to Annabelle imposed on him by law (see *Vai* v. *Bank of America* (1961) 56 Cal.2d 329 [15 Cal.Rptr. 71, 364 P.2d 247]); that the effect of the "warranty" provision of the agreement was to reaffirm, not to add to that fiduciary duty; that since he has not breached his fiduciary duty he has not breached his duty under the agreement; consequently, the court erred as a matter of law in awarding Annabelle damages. Annabelle's position in support of the judgment is that whether or not Ralph fulfilled his fiduciary duty to her is immaterial, since the agreement imposes on Ralph an absolute duty to assign a correct value to each item of community property; that the value assigned in the financial statement to the Coast Standard stock was the $70,000 "cost basis" or "carrying value" listed in the body of the statement, not the $471,080 figure contained in the footnote; and that by the terms of the agreement Ralph is liable to her for one-half (½) the difference between the listed value ($70,000) and the value found by the court ($471,080).

■ The question presented, then, is what is the proper interpretation of the warranty provision of the marital settlement agreement? Inasmuch as there was no conflicting evidence at trial as to the interpretation of the warranty, it is our function to interpret the words of the warranty as a matter of law. (See *Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal. Rptr. 801, 491 P.2d 385]; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

In attacking the judgment as it relates to the Coast stock, Ralph invites our attention to two passages in the warranty: "Wife . . . specifically does not, by the execution of this instrument, waive the benefit of any fiduciary obligation on the part of husband to make a full and complete disclosure of the nature and extent of the community property to her," and "Husband further warrants and represents to Wife that he had disclosed the true value thereof." On the other hand, in support of the implied finding of value of the Coast stock, Annabelle relies on the language ". . . if the values placed on properties retained by Husband should prove to be understated, . . . then Husband shall . . . pay over to Wife one-half (½) of the additional value . . . ."

---

[3]The concession is understandable. Ralph not only failed to request findings of fact, but there was evidence indicating the Coast stock owned by the parties had a value in excess of $800,000.

To interpret the agreement we must consider all the terms thereof (Civ. Code, § 1641; *Sunset Sec. Co.* v. *Coward McCann, Inc.* (1957) 47 Cal.2d 907, 911 [306 P.2d 777]), together with the circumstances surrounding its execution. (Civ. Code, § 1647, Code Civ. Proc., § 1860; *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 761 [128 P.2d 665].)

There was uncontroverted evidence that Ralph was anxious to have the agreement executed as soon as possible to protect his credit standing; that Annabelle believed Ralph's valuation of the various community assets; that she had repeatedly refused to permit appraisals and audits of Ralph's business assets; that by the end of the first week of November 1969, if not sooner, she no longer trusted her attorney, Milan Dostal; and that the guarantee provisions were inserted into the agreement by her attorney for the express purpose of protecting Annabelle against her own refusal to make full investigation of the assets. ■ Reading the provisions of the agreement together, in light of the circumstances here enumerated, leads us to the inescapable conclusion that the interpretation given to the agreement by the trial judge was correct: that, irrespective of any considerations of good or bad faith, or of disclosure or non-disclosure, Ralph is liable to Annabelle for one-half (½) the difference between the value placed on the Coast Standard stock by him in the body of the agreement and the fair market value determined by the trial court.

Ralph further contends that the language "values placed on properties retained by husband" must refer, in the case of the Coast Standard stock, to the "current market value of $471,080.00" contained in the footnote to the financial statement. Annabelle, of course, insists that the value referred to is the "cost basis" or "carrying value" of $70,000 contained in the listing of assets in the body of the financial statement.

■ Where the parties question the interpretation of critical language in an instrument, the language will generally be held to be ambiguous (see *Collins* v. *Home Savings & Loan Assn.* (1962) 205 Cal.App.2d 86, 97 [22 Cal.Rptr. 817]), and where ambiguity or uncertainty in the terms of a written instrument cannot otherwise be reconciled, the agreement must be construed most strictly against the party whose agent prepared the instrument or the ambiguous portion thereof. (Civ. Code, § 1654; *Coutin* v. *Nessanbaum* (1971) 17 Cal.App.3d 156, 162 [94 Cal.Rptr. 453]; *Smith* v. *Arthur D. Little, Inc.* (1969) 276 Cal.App.2d 391, 399 [81 Cal.Rptr. 140].) Thus, where the written lease of a gas production plant contained minimum rent provisions amounting in one clause to $750 per month,

and in another to $375 per month, the court construed the lease against defendant-lessee, whose attorneys had drafted it, and awarded plaintiff-lessor the greater amount of rent. Applying the same principle to the case under review, it is clear that the trial court's interpretation was correct, even though Annabelle's attorney drafted the agreement, inasmuch as the financial statement which accompanied the agreement was prepared for Ralph by his own accountant, Waegele.

■ On the other hand, the aforementioned rule does not apply where the meaning of each term can be ascertained by fair inference from the other terms (*Hawkins* v. *York* (1969) 2 Cal.App.3d 98, 106 [82 Cal. Rptr. 434]), and where two clauses of a contract are apparently in direct conflict, it is the duty of the court to reconcile the conflicting clauses so as to give effect to the whole of the instrument, if that is possible within the framework of the general intent or predominant purpose of the instrument. (Civ. Code, § 1652; *Todd* v. *Superior Court* (1919) 181 Cal. 406, 418-419 [184 P. 684, 7 A.L.R. 938]; *Welk* v. *Fainbarg* (1967) 255 Cal.App.2d 269, 275 [63 Cal.Rptr. 127].) There is an obvious conflict between the value of $70,000 given in the body of the financial statement and the value of $471,080 given in the footnote, but mere conflict does not, in and of itself, serve to create uncertainty or ambiguity. (*Small* v. *Ogden* (1966) 259 Iowa 1126 [147 N.W.2d 18, 21].) In *Small,* the court found unambiguous a land sale contract which provided for a purchase price of $30,000 and payments totalling $38,385.77, and that "Payments do not bear interest." After considering both the terms of the agreement and evidence of the negotiations preceding execution, the court concluded that interest had been predetermined and added in advance to the periodic payments, resulting in the higher total payments.

■ To us it seems clear from the wording of the footnote, as explained by the testimony at trial, that the footnote was inserted, not to contradict the value of $70,000 assigned the Coast Standard stock in the body of the financial statement, but to explain why that particular value was chosen. The testimony of Jennings Felix, Ralph's attorney in the Coast-Founders stock deal, lends strong support to this conclusion, and Felix' further testimony, offered by Ralph but rejected by the court (see below) would have lent further support to the same conclusion. Such testimony was to the effect that the footnote was not inserted for the purpose of stating the value of Coast Standard, but merely to make a full disclosure to Annabelle of the factors entering into a fair valuation.[4]

---

[4]As indicated above, whether or not Ralph met his duty of disclosure is not germane to the question of his liability to Annabelle under the terms of the warranty provisions of the agreement.

■ Finally, it is the duty of the court to give a reasonable interpretation to the agreement (Civ. Code, § § 1643, 3542; *Rodriguez* v. *Barnett* (1959) 52 Cal.2d 154, 160 [338 P.2d 907]), and when two interpretations are offered, one of which is plainly unreasonable, the court must adopt the other. (See *Barlan, Inc.* v. *Reagan* (1963) 220 Cal.App.2d 116, 118-119 [33 Cal.Rptr. 831].) ■ In the case at bench, it is not reasonable to interpret the "value placed on" the Coast Standard stock by Ralph in the financial statement as $471,080, even though he did assign that value in the footnote, when the amount of $70,000 was used in the "Schedule of Assets" in the body of the financial statement to compute the total assets of the parties. If the amount shown in the footnote had been used, the total assets shown in the financial statement, to wit, $2,148,225.26, would have been greater by $401,080, a difference of 18 percent. The difference in the net worth computed by subtracting the total liabilities of $773,838.04 would have been 29 percent. Consequently, the trial court was correct in construing $70,000 as the "value placed on" the Coast Standard stock by Ralph, and computing Annabelle's damages accordingly.

## EXCLUSION OF HEARSAY TESTIMONY

■ Ralph next assigns error in the trial court's refusal to permit Jennings Felix, the attorney who represented him in the Coast-Founders transaction, to testify as to the instructions he gave Karl Waegele, Ralph's accountant, relating to the valuation of the Coast Standard stock, particularly in the footnote of the financial statement alluding to a value of $471,000. The court's ruling was correct. Whatever instructions Felix gave Waegele had no bearing on the question before the court, i.e., the value as of November 15, 1969 of the Coast Standard stock. Moreover, Felix was permitted to testify at great length as to his opinion of the value of the stock ($35,000) and his reasons for that opinion.

Ralph argues that the excluded testimony was relevant to interpret the true meaning of the two valuations of Coast Standard stock ($70,000 vs. $471,000) and should have been permitted under the general rule that extrinsic evidence should be admitted to explain the meaning of a written instrument where the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. (See *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d 33, 37.) The foregoing rule is not applicable here, where in view of our interpretation of the warranty provisions of the agreement, the footnote becomes superfluous and its meaning irrelevant. Coast Standard was valued at $70,000 in the body of the agreement, and nothing Felix told Waegele

could be relevant to any reasonable interpretation of the term "$70,000.00" other than that plainly discernible from the face of the agreement itself.

### PAYMENT IN CASH OR IN KIND

■ Ralph's final contention is that the trial court erred as a matter of law in awarding Annabelle a money judgment, inasmuch as the agreement granted him the option of paying either *in cash* or *in kind*. While the agreement is far from clear on this point and Ralph's contention seems to have some merit, we conclude that reversal is not required inasmuch as Ralph's attack goes essentially to the form of the judgment. Ralph had the opportunity to object to the proposed judgment submitted by Annabelle's attorneys, and to request a hearing thereon. (Cal. Rules of Court, rule 232(f), (h).) He did not do so. The point was never raised during the trial nor was a motion for a new trial submitted. There is nothing in the record to indicate that the court or counsel for either side even considered the question.

It is the general rule that an appellate court will not consider questions that could have been raised in the trial court, but were not (*Estate of Westerman* (1968) 68 Cal.2d 267, 279 [66 Cal.Rptr. 29, 437 P.2d 517]; *Apra* v. *Aureguy* (1961) 55 Cal.2d 827, 831 [13 Cal.Rptr. 177, 361 P.2d 897]), inasmuch as the trial court should be given the opportunity to rectify errors which it could easily correct. (*Sommer* v. *Martin* (1921) 55 Cal.App. 603, 610 [204 P. 33]; 3 Cal.Jur.2d, Appeal and Error, § 141, p. 605.) Therefore, Ralph cannot now raise the issue as to the form of the award at this level.

The judgment is affirmed.

Tamura, Acting P. J., and Kaufman, J., concurred.

A petition for a rehearing was denied January 5, 1973, and appellant's petition for a hearing by the Supreme Court was denied February 22, 1973.